No. 69,512

STATE OF KANSAS, *Appellee*, v. STEPHEN D. SEXTON, *Appellant*.

(886 P.2d 811)

 Opinion filed December 9, 1994. 

*M. Kristine Paredes*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Linda S. Mock*, assistant county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: The defendant, Stephen D. Sexton, was convicted by jury of second-degree murder (K.S.A. 21-3402, a class B felony) and sentenced to a term of 15 years to life imprisonment. The defendant appeals, claiming that the court erred (1) by permitting his former wife to testify about her sexual bondage experiences with the defendant during their marriage; (2) by admitting over objection certain physical objects into evidence; (3) by limiting voir dire examination; and (4) by erroneously instructing the jury regarding the credibility of witnesses. The defendant also contends that the prosecutor's remarks during closing argument denied him a fair trial. Finding no reversible error, we affirm.

The victim worked as a nurse's aide at the Mount St. Scholastica Convent infirmary in Atchison. She was the former girlfriend of the defendant. She clocked out of work at 11:00 P. M. on February 18, 1992, and left with the defendant, who had been waiting for her in the convent parking lot.

The next day, two men driving along a dirt road a few miles outside of Atchison discovered what appeared to be "a dead person", possibly "a dead lady," lying in a wooded area about 20 yards over the bank of the road. The dead person was the victim, approximately 5'2" in height, 200 pounds, naked, with leaves and mud on her body and feet. According to the investigating sheriff, the leaves and earth area around her body and up the embankment appeared to have been disturbed as though she had been dragged down the hill.

The victim was elaborately bound with ropes and pantyhose. She had a nylon rope tied at her wrists that went up her back, around her neck several times, and then down to her ankles,

where it was again tied around her ankles. In addition, she had pantyhose wrapped around her neck, under the ropes. The tension on the ropes was tight enough around the wrists, ankles, and neck that, before conducting the autopsy, the pathologist physically had to pull the ropes while an assistant cut them away. With the exception of an abrasion on her forehead, however, there were no marks on the victim's body indicating any struggle or resistance to the bondage.

The pathologist testified that the victim died as a result of "ligature strangulation from the rope ligatures around the neck." Although he was unable to state with certainty, the pathologist concluded that the ligatures around the victim's neck were tight enough to cause a "complete cut-off of air, or near cut-off of air," resulting in her death within four to five minutes. He further opined that if the strangulation was self-induced, it would more likely be accidental than purposeful, noting: "[I]f her legs were tied up and then she straightened them out, she would have lost consciousness and just the weight of her legs . . . because of her obesity . . . may have been enough to keep . . . tension on the rope."

During the autopsy, the pathologist observed evidence of stretching and a small laceration of the victim's anal mucosa. He concluded that although the stretching could be old, the tear was recent. Further, although the cause of the tear could have been from anal intercourse, the pathologist could not confirm the amount of penetration involved.

The defendant stated that while the victim and the defendant were dating, the victim had allowed herself to be bound with rope many times. During their nine-month relationship, the couple engaged in bondage sex approximately 50 times. Before her involvement with the defendant, the victim had also engaged in sexual bondage once or twice with her former husband.

Police records admitted into evidence disclosed that on August 25, 1991, the victim had been hospitalized for attempted suicide. She had initially claimed the defendant injected her with drugs to assist her suicide. She later recanted and claimed to have injected herself, stating that the defendant tried to stop her and

called the police for help. The victim's mother testified that the victim told her the defendant injected her with "some stuff" that he had obtained from nursing school. The victim's former husband also testified that the victim told him the defendant had helped her try to commit suicide "by giving her injections and stuff." The defendant testified that he did not inject her, nor did he "tell her how to do it." He stated, "I wanted to because I love her and wanted to help ease her pain but I did not help her."

The defendant testified that all acts of sexual bondage were voluntarily performed by the victim and that he never forced her to be tied up or gagged or bound in any way. The victim had discussed with friends, family members, and co-workers her sexual relationship with the defendant. In testimony, it became apparent that the victim had a difficult time choosing between the defendant and her former husband. She indicated that she loved the defendant because he was good at sex and better than she was used to with her former husband. She also indicated that because of the defendant's training as a licensed practical nurse and his regular job, the defendant could provide for both herself as well as her children in a way her former husband could not. Financial stability of the defendant, along with the victim's job at the convent, would strengthen her efforts to regain custody of her children.

The victim's co-workers also testified that the defendant and the victim would argue and fight and that the victim told them that the defendant would tie her up, handcuff her, hit her, and call her a whore, a bitch, and a slut. They also commented that she did not like to be tied up but that she allowed it because it turned the defendant on and it seemed to be just part of sexual activity with the defendant.

The day the body was discovered, the defendant gave two conflicting statements to an agent of the Kansas Bureau of Investigation. He first stated that he picked the victim up in his vehicle after she got off work, went to her residence in Atchison, made love, got into an argument, and left her, spending the night at his new girlfriend's house.

Several hours later, he stated that after picking her up at work, they went to the cemetery because she knew that he always

wanted to "make it" with her at the cemetery. He tied her up and they had sex in the back seat of the car while she was tied up. At her invitation, he put pantyhose as a gag in her mouth. He stated that he tried to have anal sex with her but could not. The defendant stated that he did not want to hurt her and that he loved her. He said that after sex she straightened her legs out. The binding around her neck was so tight he could not undo it and she was not cooperating with him. He then started driving back to Atchison, and as they crossed a dike area he heard a gurgle. He did not remember putting the body where it was found.

At trial, the defendant gave a more detailed account. He related that the victim had explained to him on the way to the cemetery the way she wanted to be tied up. She wanted the ropes up around her neck like they had done before, and she wanted a gag. He testified that the rope was loose enough so that he could stick four fingers underneath at the victim's neck and that the ropes around her wrists and ankles were not tight enough to cut off her circulation. The defendant denied trying to have anal sex with her. He was unable to get stimulated for vaginal sex and asked her if she wanted the ropes removed. When she indicated no, he left her in the backseat of the car and left to use the bathroom. When he returned, she was stretched out flat on the backseat on her stomach. He was afraid something had happened to her, tried to untie the knots, and then immediately started driving to the hospital when he heard the victim make a sound "like trying to take a breath or something."

"I stopped and opened the back door, got out, and opened the back door and checked and see if maybe there was something I could still do for her. And when I opened the door, she just kind of rolled out of the car.

. . . .

"[A]s I was getting ready to put her back in the car . . . I seen some headlights, . . . [a]nd I thought at that time of the night it could only be a sheriff or something like that. And I got even more scared. And I thought, well, I'll just roll her over to the side and I'll come back around here in a few minutes and pick her back up and take her to the hospital. And as I was walking back to get back in the car, she rolled on down the hill. And I just really panicked from there and . . . ."

While the defendant gave his statements to the KBI agent, other law enforcement officers conducted a search of his apartment and car. Photographs taken of the bedroom and from the front room of his residence, as well as physical objects confiscated from his residence and car, were introduced at trial over his objection.

(1) Testimony of the defendant's former wife about her sexual bondage experiences with him during their marriage.

Over the defendant's objection, his former wife was allowed to testify that she and the defendant, during their marriage, engaged in sexual bondage 40 or 50 times. The State filed a motion under K.S.A. 60-455 to introduce this testimony "to show lack of mistake and motive of the defendant." The court allowed the testimony, stating that, assuming the evidence to be offered was subject to K.S.A. 60-455, the court could admit the testimony independent of K.S.A. 60-455 because the evidence offered was similar in nature to and corroborated the sexual bondage acts of the defendant and the victim. In reaching its decision, the trial court relied on *State v. Jones*, 247 Kan. 537, 802 P.2d 533 (1990).

*Jones* deals with admission of prior crimes or civil wrongs under K.S.A. 60-455. However, as the defendant notes, sexual bondage between consenting adults is neither a crime nor a civil wrong under Kansas law. Therefore, the testimony of the defendant's former wife would not be governed by K.S.A. 60-455.

The court did indicate that the evidence would be independently admissible. The primary test of admissibility of evidence is its relevancy to the issue in question. *State v. Baker*, 219 Kan. 854, Syl. ¶ 1, 549 P.2d 911 (1976). In *State v. Baker*, the court said:

"Relevancy is more a matter of logic and experience than of law. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence, or if it has any tendency in reason to prove any material fact." 219 Kan. 854, Syl. ¶ 2; see K.S.A. 60-401(b).

The defendant's former wife testified that they engaged in bondage sex 40 or 50 times; that the defendant did put things around her neck but did not choke her; that the defendant de-

manded bondage; that she did it more or less willingly because she wanted to save the marriage; that at times when she objected, the defendant forcefully tied her up; and that he often left her tied up while he did other things.

The defendant's theory of defense was that the death resulted from either an intentional act of the victim or by way of accident. According to the defendant, the binding was not tight when he tied her up but because she straightened out her legs, the binding became so tight that he could not untie the knots. The prosecution sought to establish that the defendant had extensive experience with sexual bondage. The testimony, according to the State, was probative of the victim's death in that it tended to show that the defendant had experience and knowledge of his act and that the victim's death was not a mistake but intentional. It was offered to corroborate the State's contention that one so experienced knew how to accomplish the act of sexual bondage without causing harm to the victim as he had done on previous occasions with both his former wife and the victim in this case.

The court limited the evidence of prior similar acts by giving the following limiting instruction:

"Evidence has been admitted of other similar sexual bondage acts of the defendant.

"This evidence may be considered solely for the purpose of proving the defendant's intent and/or absence of accident and/or corroborating the evidence concerning sexual bondage in this case."

The evidence of past acts of sexual bondage with his former wife, as the defendant points out, was of limited value in determining the issues the jury had to decide in this case. This is true because the defendant admitted that sexual bondage was a regular practice between him and the victim. The defendant never denied these acts, and the issue before the jury was whether the defendant intentionally killed the victim, not whether he had engaged in acts of sexual bondage with the victim.

A trial court's ruling on the relevancy of evidence is discretionary and will not be disturbed absent a clear showing of abuse of discretion. *State v. Cooper*, 252 Kan. 340, 348, 845 P.2d 631 (1993). The burden on the defendant is to demonstrate that no

reasonable person would take the view adopted by the trial court. *State v. Heywood*, 245 Kan. 615, 621, 783 P.2d 890 (1989). While admissibility in this case is questionable, we cannot say that the defendant has established an abuse of discretion.

Because of the closeness of the question, we consider the defendant's second contention that the prejudicial effect of the evidence far outweighed the probative value of the evidence and denied him a fair trial. We address this question even though the defendant did not base his objection on prejudice at trial but limited his objection to relevancy of the evidence.

Admission of the evidence of prior acts of sexual bondage did not deprive the defendant of a fair trial. The defendant admitted that sexual bondage was a regular practice between himself and the victim. He testified that the practice was always voluntary and generally at the request of the victim. Evidence also was presented that the victim had engaged in sexual bondage with her former husband. There was never an issue as to whether the victim and the defendant engaged in sexual bondage. The sole issue was whether the defendant intentionally killed the victim. Testimony from the defendant's former wife may have, in fact, been beneficial to the defendant in that it demonstrated that he had never harmed his former wife during any acts of sexual bondage. Under all the circumstances, we conclude that the admission of this evidence, although questionable, was harmless beyond a reasonable doubt.

On appeal, but not at trial, the defendant claims that his former wife's testimony should not have been admitted because of marital privilege. "The defendant cannot raise points on appeal which were not presented to the trial court." *State v. Holley*, 238 Kan. 501, 508, 712 P.2d 1214 (1986). Even if we were to consider his contention, the communications offered at trial were not confidential. The entire question had been the subject of a custody dispute (on the record) between the defendant and his former wife over their daughter.

(2) Physical objects admitted over objection.

The defendant complains the trial court erroneously admitted

nine items of evidence and, in so doing, deprived him of a fair trial because the items were not only irrelevant to issues in question, but also prejudiced the jury against the defendant. The nine items in contention are as follows:

| Exhibit No. | Description |
| --- | --- |
| 24 A | Photo: Left side of the defendant's bed showing a restraint device hooked under the mattress around the bed frame. |
| 24 B | Photo: Right side of the defendant's bed showing a restraint device secured to leg of headboard. |
| 24 C | Photo: Bundle of white cord on bedroom floor. |
| 24 D | Photo: Pair of handcuffs hanging on wall in the defendant's front room. |
| 24 E | Photo: Overview of the defendant's bedroom. |
| 25 and 26 | Two notebooks—Captain's Logs (stardated) |
| 29 | Dog choker chain with padlock but no key— removed from floorboard of the defendant's car. |
| 33 | Bible with markers—removed from trunk of the defendant's car. |

For each item, the defendant objected on the basis of relevance. The defendant claims the trial court erred because it admitted each item based on "possible" relevance rather than "actual" relevance. Again, the test of admissibility of evidence is its relevance to the issue in question. *State v. Baker*, 219 Kan. 854. Syl. ¶ 1. K.S.A. 60-401 sets forth the following definitions:

"(a) 'Evidence' is the means from which inferences may be drawn as a basis of proof in duly constituted judicial or fact-finding tribunals, and includes testimony in the form of opinion, and hearsay.

"(b) 'Relevant evidence' means evidence having any tendency in reason to prove any material fact."

Thirty years ago, in *In re Estate of Isom*, 193 Kan. 357, 364, 394 P.2d 21 (1964), this court considered problems relating to relevancy of evidence and quoted the following rule from 20 Am. Jur., Evidence § 248:

" 'Evidence of collateral issues may, however, be relevant if the fact which it tends to establish will tend to prove or [disprove] the fact in issue, as where it has a natural tendency to corroborate or supplement admitted direct evidence. In other words, while the evidence offered must be confined to, it need not bear directly upon, the issues. But to render evidence of collateral facts competent, there must be some natural, necessary, or logical connection between them and the inference or result which they are designed to establish.' (p. 243.)"

Twenty years ago, in *State v. Fagan*, 213 Kan. 587, 589, 518 P.2d 552 (1974), this court cited the following rule from 22A C.J.S., Criminal Law § 628, pp. 472-73: "The rule is, generally, that evidence of the attending circumstances at the time an accused is arrested, including articles of property which are found in his possession, is relevant and admissible where the circumstances logically tend to connect the accused with the crime charged.

Subject to certain exclusionary rules, the "[a]dmissibility of physical evidence is within the sound discretion of the court and is to be determined by the court on the basis of its relevance and its connection with the accused and the crime charged." *State v. Beard*, 220 Kan. 580, Syl. ¶ 3, 552 P.2d 900 (1976). In *State v. Ji*, 251 Kan. at 15, we said:

"[W]hen a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it."

## The Photographs

The defendant argues the photographs had no probative value and did not help prove any material fact but, rather, were cumulative and prejudicial. The State responds that this court's analysis and holding in the case *State v. Cooper*, 252 Kan. 340, applies to this case and supports the trial court's ruling.

In *Cooper*, the defendant was charged with rape and aggravated criminal sodomy. The defendant argued that certain physical evidence admitted was irrelevant. He contended one item, a knife found at the scene of the alleged rape, had no probative value because it was not linked directly to him through either any eyewitness or scientific evidence. After reviewing testimony by the

investigating officer that the victim claimed she had been threatened and a knife was involved, the knife in question was recovered from the scene, and the property owner could not identify the knife, this court ruled there was no abuse of discretion in admitting the knife. 252 Kan. at 348-49.

This case differs from *Cooper* in that the evidence complained of was not recovered at the scene of the alleged crime. The photographs were of the defendant's bedroom and apartment. The victim's death did not occur at the defendant's apartment. Notwithstanding these differences, however, *Cooper* supports the result in this case. In *Cooper*, this court agreed that the trial court also properly admitted a tatoo book over the defendant's objections. The book was not offered to prove the defendant raped the victim but, rather, was offered into evidence to corroborate the testimony of other witnesses regarding the events on the evening in question. 252 Kan. at 349. In the present case, given the State's assertions regarding the defendant's knowledge of and experience with sexual bondage, a reasonable person could find the photographs of the defendant's bedroom and apartment probative to corroborate the testimony of other witnesses. Therefore, the trial court's reasoning, albeit less than specific, does not rise to the level of abuse of discretion.

### The Dog Choker Chain

At trial, a KBI agent testified that he removed a dog choker chain from "between the driver's seat and the door, right on the floorboard of [the defendant's] car." The agent further testified that when he was at the defendant's apartment, he saw no evidence that the defendant had any dogs or cats or other pets.

After the State offered the choker into evidence, defense counsel objected: "I'm trying to understand the relevance of that item, your Honor. I'd have to object to it also." The trial court responded: "The Court finds that your objection should be overruled. And the Court admits into evidence State's Exhibit No. 29. I think with the evidence that we've had concerning the sexual bondage, that this could be evidence concerning that. And so it could be relevant."

The defense counsel then argued: "I just haven't heard any bondage regarding a dog choker chain. So, I guess, maybe I'm being—maybe that's something new, Judge." The trial court answered: "Well, I guess—and I don't know anything about bondage, I'll assure you, . . .—but I would think that all of this could be a part. I don't know. It could be relevant."

Here, unlike the photographs of the defendant's bedroom and apartment, the choker was recovered from the scene of the alleged crime—the defendant's car. When a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, the object should be admitted for such weight and effect as the jury sees fit to give it, unless it is clearly irrelevant. *Cooper*, 252 at 348. Under our holding in *Cooper*, even though there was no specific evidence regarding a choker, the trial court properly admitted the evidence to corroborate evidence of the defendant's practice of sexual bondage acts. It was admitted for such weight and effect as the jury saw fit to give it. See *State v. Ji*, 251 Kan. at 15.

### The Captain's Logs

The defendant claims the trial court erred by allowing into evidence two complete notebooks labeled "Captian's [sic] Logs." According to the defendant's brief, these logs comprised more than 200 typed pages of a "combination of fantasy and diary" prepared by the defendant during a three-year period of time (1989-1992).

The trial court overruled the defendant's objection and admitted both logs in their entirety, claiming they "[c]ould be relevant." The defendant concedes that the portions of the logs referring to the victim may be relevant, but contends that admitting the logs in their entirety was error.

The State argues that the entire logs are admissible since they were relevant as corroborating evidence and probative with respect to the defendant's sexual fantasies and relationships with women in general. In addition, the writings detail the defendant's plans or desires to control certain women and, on occasion, to kill specified women, making the deaths appear to be suicides.

Therefore, such writings would be relevant as to the defendant's intent or motive. Finally, the State points out that some of the writings actually benefit the defendant by demonstrating his affection for the victim.

While this case differs from *Cooper* because the evidence to which the defendant has objected was not obtained at the scene of the alleged crime, where the evidence has been offered to corroborate the testimony of other witnesses or where the evidence was in the defendant's possession at the time he was arrested, we conclude that the court did not abuse its discretion by admitting the log.

## The Bible

The defendant claims the trial court error in admitting into evidence a Bible, with several markers in it, recovered from the trunk of his car. When the State offered the Bible into evidence, defense counsel objected: "Your Honor, I'm really trying to be open-minded about how this Bible fits in with bondage. And I think maybe that's stretching it. So I'm going to have to—I'm glad my client reads the Bible—but I'm going to have to object to the relevancy of it."

The trial court admitted the Bible, stating: "[The Bible] could be relevant just like the erotic magazines could be relevant in some way. The passage from the Bible could be too in one sense."

The defendant claims the trial court focused on only one passage that the defendant had marked in the Bible; namely 2 Kings 9:30, concerning Jezebel's violent death. The defendant claims the court did not determine the relevancy of the Bible or this passage and, thus, admitted the Bible in error.

We conclude that the admission of the Bible was relevant and admissible for whatever weight the jury would give it. The defendant's objection related to weight, not admissibility. Thus, the defendant has failed to establish an abuse of discretion.

Finally the defendant argues that even if all items were relevant, the court committed reversible error by allowing their admission into evidence because the prejudicial effect of these nine items on the jury outweighed any probative value they may have had.

The specific grounds for an objection to the admission of evidence must be given at trial to preserve the issue for appeal. K.S.A. 60-404; *State v. Cooper*, 252 Kan. at 349. The record in this case does not reflect that the defendant sought the trial court's ruling on the question of prejudice for these nine items of evidence. Thus, the defendant did not preserve the issue for appeal. Because the trial court did not err in determining the items were relevant, there was no abuse of discretion in admitting any of the nine items.

(3) Limitation of voir dire examination.

The record demonstrates that the trial court did not limit defense counsel's questions on voir dire examination. Counsel filed a motion for individual voir dire for the purpose of discovering prospective jurors' scope of knowledge of sexual bondage, including potential bias or prejudice.

Although defense counsel questioned potential jurors about sexual bondage during voir dire, the defendant claims his attorney "necessarily refrained from further, more probing questions." The defendant claims the trial court's denial of the request for individual voir dire and the court's attitude that "bondage is a crime" precluded the defendant's attorney from uncovering potential prejudice among prospective jurors.

The defendant's argument that his attorney was restrained from asking additional questions during voir dire is without merit. At the hearing on the defendant's motion for individual voir dire, the trial court advised counsel that the court would "come out with a couple statements in advance . . . so that they'll have pretty much full understanding of what it [sexual bondage] means." The defendant's attorney expressed concern that "most people probably know what it [sexual bondage] is. I just worry that they won't admit that they know what it is. That's what I'm trying to find out." The trial court properly stated that it would not allow defense counsel the opportunity to ask prospective jurors whether they had personally been involved in sexual bondage. The defendant does not contest this ruling on appeal. The record reveals no further request by the defense counsel to conduct in-

dividual voir dire. Moreover, the record reveals no specific written directive by the trial court limiting the scope of inquiry on the subject of sexual bondage. Both parties acknowledge this in their briefs.

Counsel for both parties questioned prospective jurors without trial court intervention. Jurors were not asked about their moral attitudes regarding sexual bondage. Jurors were asked whether they knew what sexual bondage was and whether they believed they could listen to the evidence fairly and consider the case without bias or prejudice. Jurors responded affirmatively. Defense counsel, rather than the trial court, limited his questioning of prospective jurors on the subject of sexual bondage.

### (4) Instructions on credibility.

The defendant argues the trial court erred when it offered an expanded jury instruction regarding the credibility of witnesses. The three jury instructions relevant to the defendant's argument read as follows:

#### INSTRUCTION NO. 9

"Evidence has been admitted of other similar sexual bondage acts of the defendant.

"This evidence may be considered solely for the purpose of proving the defendant's intent and/or absence of accident and/or corroborating the evidence concerning sexual bondage in this case."

#### INSTRUCTION NO. 10

"The credibility of a witness may be attacked by:

"Inquiry touching upon his or her prior conduct, or evidence that on some former occasion he or she made a statement, or acted in a manner, inconsistent with his or her testimony in this case on a matter material to the issues.

"You may consider evidence of this kind, in connection with all the other evidence, only as it may have a bearing on impairing his or her credibility as a witness, that is, in deciding the weight and credit to be given the testimony of that witness."

#### INSTRUCTION NO. 15

"It is for you to determine what weight and credit was to be given the testimony of each witness. You have a right to use common knowledge and experience in regards to any matter about which any witness has testified to."

The defendant acknowledges Instruction No. 15 is the approved PIK Crim. 3d 52.09 instruction on the credibility of wit-

nesses, but claims the trial court erred by offering the expanded Instruction No. 10 in light of Instruction No. 9. The defendant claims that because his entire case was based upon the jury's belief of his veracity, Instruction No. 10 caused the jury to focus on Instruction No. 9 and thereby place undue attention on the defendant's prior acts of sexual bondage.

In considering jury instructions, this court will read the instructions together as a whole and not isolate any one instruction. *State v. Walker*, 252 Kan. 279, 295, 845 P.2d 1 (1993). "If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. [Citation omitted.]" 252 Kan. at 295.

With respect to the use of PIK instructions, this court has stated that "[t]he use of PIK instructions is not mandatory, but is strongly recommended." *State v. Dunn*, 249 Kan. 488, 492, 820 P.2d 412 (1991). The *Dunn* court further stated:

"The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed." 249 Kan. at 492-93.

The record in this case reveals no objection to Instruction No. 10 by either counsel before the jury retired. The defendant, instead, objected only to the jury instruction regarding the jury's ability to come to a consensus.

K.S.A. 22-3414(3) provides:

"No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he objects and the grounds of his objection unless the instruction is clearly erroneous. Opportunity shall be given to make the objections out of the hearing of the jury."

In *State v. Maxwell*, 234 Kan. 393, Syl. ¶ 5, 672 P.2d 590 (1983), this court stated the following rule pertaining to review

of unobjected-to jury instructions: "When an instruction has not been objected to at trial, this court's scope of review is limited to a determination of whether the instruction is clearly erroneous."

The defendant carries the burden on appeal to establish the trial court was clearly erroneous in its offering of Instruction No. 10. "An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict. [Citation omitted.]" *State v. Deavers*, 252 Kan. 149, 164-65, 843 P.2d 695 (1992), *cert. denied* 125 L. Ed. 2d 676 (1993).

According to the defendant, Instruction No. 10 "goes beyond poor judgment into error" because it singles him out, emphasizes false or inconsistent testimony, and directs the jury to consider the defendant's prior conduct solely as reflected in Instruction No. 9. The State claims Instruction No. 10 clearly explains the manner in which the jury may consider prior conduct: "based upon prior conduct or evidence that on some former occasion he or she made a statement, or acted in a manner inconsistent with his or her testimony in this case on a matter material to the issues." The State claims Instruction No. 10 does not single out the defendant but, rather, identifies various factors for testing witnesses.

In Kansas, a trial court does not err as a matter of law by giving a neutral instruction on a defendant's credibility. *State v. Land,* 14 Kan. App. 2d 515, 519, 794 P.2d 668 (1990). The question this court faces is whether Instruction No. 10, read together with limiting Instruction No. 9 and PIK Crim. 3d 52.09 (Instruction No. 15) could have caused the jury to arbitrarily single out the defendant's testimony and scrutinize it differently from the testimony of other witnesses.

This court has reviewed challenges to unobjected-to expanded PIK Crim. 3d 52.09 instructions on several occasions. In *State v. Clements*, 241 Kan. 77, 734 P.2d 1096 (1987), the defendant failed to object at trial to the following instruction relative to witness credibility:

"It is for you to determine the weight and credit to be given to the testimony of each witness. You have a right to use that knowledge and experience which

you possess in common with men in general, in regard to the matter about which a witness has testified. You may take into account the witnesses['] ability and opportunity to observe and know the things about which he or she has testified, their memory, manner and conduct while testifying, and any interest they may have in the result of this trial, and the reasonableness of their testimony considered in the light of all the evidence in this case." *Clements,* 241 Kan. at 80-81.

The defendant in *Clements* argued trial court error in allowing this instruction instead of PIK Crim. 2d 52.09. This court concluded the instruction was not clearly erroneous based on the holding in *State v. Willis,* 240 Kan. 580, 731 P.2d 287 (1987), involving an unobjected-to instruction with the following similar language:

" 'It is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use that knowledge and experience which you possess in common with persons in general in regard to the matter about which a witness has testified. You may take into account ability and opportunity of the witness to observe and know the things about which the witness has testified; his/her memory, manner, and conduct while testifying; any interest he/she may have in the result of this trial, and the reasonableness of the testimony given, considered in the light of all the evidence in this case.

" 'The weight of the evidence on any issue is not determined by the number of witnesses but by how reasonable, persuasive, and satisfying the evidence is to you.

" 'If you find that any witness has willfully testified falsely concerning any material matter, you have a right to distrust the testimony of that witness in other matters and you may reject all or part of the testimony of that witness, or you may give it such weight as you think it deserves. You should not reject any testimony without cause.' " *Willis,* 240 Kan. at 586.

In *State v. Land,* 14 Kan. App. 2d at 516, the trial court gave the following jury instruction without objection: "An accomplice witness is one who testifies that she was involved in the commission of the crime with which she and the other defendants were charged. You should consider with caution the testimony of an accomplice."

The defendant, tried with two other codefendants, claimed error in the giving of an instruction that referred to accomplice testimony when the defendant was testifying both as an accomplice and as a defendant. Our Court of Appeals agreed that the

instruction given in *Land* "was not neutral. . . . [I]t arbitrarily singled out [the defendant's] testimony and would cause a jury to scrutinize it differently than other testimony." 14 Kan. App. 2d at 520.

In this case, whereas it certainly would have been the better practice by the trial court to give only the PIK Crim. 3d 52.09 instruction (Instruction No. 15), the giving of Instruction No. 10 was not clearly erroneous. The language of Instruction No. 10 and its possible effect more closely resembles the language of the instruction given in *Clements* and *Willis* than in *Land*.

In addition to the defendant, there were numerous witnesses, male and female, who testified. On more than one occasion, counsel pointed out inconsistent statements offered at the pretrial hearing and at trial. The language of Instruction No. 10 does not tell the jury to "consider with caution" the testimony of any particular witness. Moreover, the language of Instruction No. 10 does not direct the jury to focus on only male or female witnesses.

Instruction No. 10 does not single out the defendant. Nor does the language emphasize false or inconsistent testimony by the defendant or direct the jury to consider the defendant's prior conduct solely as reflected in limiting Instruction No. 9. In addition, the trial court also specifically instructed the jury to "assume that the defendant is innocent unless you are convinced from all of the evidence in the case that he is guilty," and "[y]ou must weigh and consider this case without favoritism for or prejudice against either party. You must not be influenced by anything not within the issues of the case. Sympathy should not enter into your deliberations."

We conclude that when Instruction No. 10 is read together with the other instructions, Instruction No. 10 is not clearly erroneous.

(5) Prosecuting attorney's remarks during closing arguments.

The defendant claims that certain remarks made by the prosecutor during closing arguments require reversal, notwithstanding his failure to object at trial. In Kansas, the general rules pertaining to prosecutorial misconduct are clear:

"Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. [Citation omitted.] The prosecutor is entitled to considerable latitude in arguing the case to a jury. There is no prejudicial error where the questionable statements of a prosecuting attorney are provoked and made in response to previous arguments or statements of defense counsel. [Citation omitted.] Since Kansas does not follow the 'plain error' rule used in federal courts, reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection is lodged. [Citation omitted.] Remarks made by the prosecutor in closing argument are harmless error if the court finds that the error had little likelihood of changing the result of the trial." *State v. Baker*, 249 Kan. 431, 446, 819 P.2d 1173 (1991).

The defendant concedes that no objection was made at trial to the prosecutor's closing argument. Nor did defense counsel seek the trial court's admonishment of the jury to disregard the challenged statements. Further, the defendant failed to raise the issue of prosecutorial misconduct in his motion seeking a new trial.

This court has repeatedly held that "[r]eversible error cannot be predicated upon a complaint of misconduct of counsel during argument where no contemporaneous objection is lodged." *State v. Bird*, 238 Kan. 160, 179, 708 P.2d 946 (1985). The defendant has failed to preserve his claim of error.

Affirmed.