No. 72,708

S<small>TATE OF</small> K<small>ANSAS</small>, *Appellee*, v. A<small>LVIN</small> L. G<small>AINES</small>, *Appellant*.

(926 P.2d 641)

Opinion filed October 25, 1996.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Steven R. Zinn*, deputy appellate defender, was with him on the brief for appellant.

*Paul J. Morrison*, district attorney, argued the cause, and *Carla J. Stovall*, attorney general, and *Steven J. Obermeier*, assistant district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Alvin L. Gaines, from his convictions in Johnson County District Court of one count each of rape, aggravated kidnapping, and aggravated criminal sodomy. On appeal, the defendant challenges the exclusion of expert trial testimony regarding eyewitness identification, makes a claim that the photographic lineup from which he was identified was unduly suggestive, and argues that the admission of his ex-wife's trial testimony regarding his participation in toe sucking was improper.

The victim in this case, 14-year-old J.K., was sexually assaulted in her neighborhood. J.K. was walking by a street light in the early morning hours when she heard footsteps behind her. J.K. turned and saw a man jogging toward her. The man told J.K., "That's a long jog, isn't it," and asked J.K. where she was going. When J.K. told him, the man asked if he could walk with her. J.K. replied, "No," and tried to run away. The man grabbed J.K. from behind. He put his hand over her mouth and placed a knife against J.K.'s throat. The man threatened J.K. that if she said anything he would cut her.

The man led J.K. behind an air conditioning unit of a nearby home. She was told to remove her clothes. For approximately an hour, the man forced her to engage in sexual activity. At one point, the defendant took J.K.'s right foot and brushed it off with his hand; then the man started sucking on J.K.'s right big toe as if he were sucking on a thumb. Later, he picked up the same foot and sucked on J.K.'s big toe again. During much of the attack, J.K.'s sweater was pulled up over her head. J.K. testified that she could see the man through the sweater.

J.K. reported the incident to the police and described her attacker as a stocky man with a pretty big belly, who was dressed in

a dark shirt and pants, a dark ball cap, running shoes, and glasses. A police officer also testified that J.K. described her attacker as being very dark complected. Shortly after the attack, the police showed J.K. a photographic lineup in which at least three of the pictures were of very dark-complected men. This lineup did not contain a picture of the defendant. J.K. thought that one of the pictures resembled the attacker, but stated it was not him. J.K. also looked at a large number of pictures in mug books containing pictures of white, Hispanic, and Native American men. J.K. thought that two of the pictures resembled her attacker, but stated neither man was her attacker.

Following the assault, J.K. underwent fairly severe anxiety attacks. She experienced panic attacks whenever she saw any dark-skinned man who generally resembled the attacker. On one occasion, she was working as a hostess at a local restaurant. She saw a man enter with his family, and after hearing him speak, she thought he might be her attacker. She called the police, who came to the restaurant. The police talked to the man in front of the restaurant while J.K. observed the man with binoculars from a police car. She decided that the man was not the man who had attacked her.

Nearly 2 years after the attack, the police asked J.K. to look at some more pictures. J.K. went to the police station, signed an orientation sheet, and looked at a six-person photographic lineup. This second photographic lineup was not race-specific. A photograph of the defendant, a Native American, was included in the lineup. J.K. immediately identified the defendant's picture as the man who attacked her. At trial, J.K. identified the defendant as the person who attacked her. In identifying the defendant at trial, J.K. stated, "I just know one hundred percent for sure. Because of the facial features that he has and I never forgot exactly what he looked like."

The defendant's trial centered on identification issues. The defendant's ex-wife testified that she married the defendant in August 1987 and that the two were married for 1 year. She testified that on about five occasions, during the course of sexual activity, the defendant had sucked on her big toes. The defendant would suck on her big toe as if he were sucking on a thumb.

In his defense, the defendant tried to admit the testimony of an expert witness on the issue of eyewitness identification. The district court excluded this testimony. The court found that most of the testimony did not provide information which was beyond a jury's common knowledge and that some of the testimony invaded the province of the jury by evaluating the confidence and credibility of J.K. and her eyewitness identification testimony.

## EYEWITNESS IDENTIFICATION

The defendant filed a pretrial motion requesting permission to introduce the testimony of an eyewitness identification expert at trial. At a hearing on the motion, the defendant made a proffer of the expert's testimony.

The expert's proffered testimony focused on the problems of eyewitness identification. He discussed the increased possibility of error in cases involving cross-racial identification, and he noted that high levels of stress could possibly reduce the accuracy of an identification, depending upon the stressor and how a person responds to stress. The expert witness also discussed how the passage of time could decrease the likelihood of an accurate identification. Finally, the expert explained how scientific studies have demonstrated that there is a low correlation, if any, between a witness' level of confidence in an identification and the actual accuracy of the identification.

The court denied the defendant's pretrial motion and excluded the expert testimony from trial. In so holding, the trial court found that expert testimony on the reliability or accuracy of a witness' identification was precariously close to expert testimony regarding the witness' credibility as a witness. Thus, the court found the testimony improperly invaded the province of the jury.

At trial, the defendant renewed his proffer of this expert testimony, which the trial court excluded. However, the trial court did modify the PIK Crim. 3d 52.20 jury instruction on eyewitness identification by removing factor 6 relating to the degree of certainty demonstrated by the eyewitness. The defendant challenges the district court's exclusion of the eyewitness identification expert testimony.

"The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion." See *State v. Cheeks*, 253 Kan. 93, 99, 853 P.2d 655 (1993); *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 8, 822 P.2d 591 (1991); *In re Application of City of Great Bend for Appointment of Appraisers*, 254 Kan. 699, Syl. ¶ 5, 869 P.2d 587 (1994).

According to the defendant, several factors, which were beyond common knowledge and understanding of the jurors, made the victim's eyewitness identification unreliable. Thus, the defendant argues that an expert was necessary to generally identify and explain these factors to the jury. These factors included the cross-racial identification, the 2-year length of time between the attack and the identification, the lineup procedure, the extreme stress the victim experienced during the attack, the victim's previous near-identifications of persons with similar features, and the fact that the degree of certainty expressed by the victim in her identification of the defendant had little, if any, correlation to the reliability of her identification.

The defendant asserts that the court could have allowed the expert witness to testify and restricted the expert from offering a direct opinion that the victim was mistaken in her identification of the defendant as her attacker. In this manner, the expert could have informed the jury of information beyond their common knowledge without entering into the jury's province and testifying as to the credibility of an eyewitness or her identification testimony. On the other hand, the State asserts that the expert testimony on eyewitness identification attempted to invade the province of the jury and was properly excluded.

This court's position on the admissibility of expert testimony regarding eyewitness identification has evolved over the last 2 decades, as illustrated in a discussion of the following cases. In *State v. Reed*, 226 Kan. 519, 601 P.2d 1125 (1979), a jury convicted the defendant of rape and aggravated kidnapping. The convictions were based mainly on the victim's identification of the defendant as the perpetrator. At trial, the defendant tried to admit expert testimony regarding the reliability of eyewitness identification. The

trial court denied the defendant's motion to admit such testimony, and the defendant appealed the ruling.

This court noted that the admission of expert testimony into evidence is a matter within the trial court's discretion. The court then gave some guidelines for the district court to use in exercising its discretion: An expert witness may testify and give his or her opinion regarding the ultimate issue of the case; however, the testimony is only admissible if it actually assists the jury. Expert opinion testimony is admissible when it " 'will aid the jury in the interpretation of technical facts or when it will assist the jury in understanding the material in evidence.' " 226 Kan. at 521 (quoting *Massoni v. State Highway Commission*, 214 Kan. 844, Syl. ¶ 3, 522 P.2d 973 [1974]). An expert's opinion testimony is inadmissible if the expert is required " 'to pass upon the credibility of witnesses or the weight of disputed evidence.' " *Reed*, 226 Kan. at 521 (quoting *Smith v. Estate of Hall*, 215 Kan. 262, Syl. ¶ 3, 524 P.2d 684 [1974]). Expert testimony is not limited to issues of science, art, or skill. Nonetheless, expert opinion testimony "cannot invade the field of common knowledge, experience and education" of a layperson, and "it cannot usurp the function of the jury if such testimony touches the very issue before the jury." *Reed*, 226 Kan. at 521-22 (citing *United States v. Brown*, 540 F.2d 1048 [10th Cir. 1976], *cert. denied* 429 U.S. 1100 [1977]).

Two years later, this court decided *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981). The only issue in the case was the identity of the defendant as one of the two robbers who took money from a restaurant. One of the robbers identified the defendant as the other robber of the restaurant. The restaurant owner testified at trial and identified the defendant as one of the robbers. The owner testified that the robbery took less than a minute and a half and that most of the time he was staring at the confessed robber, not the second robber. The owner stated that he only looked at the second robber, which he identified as the defendant, for about 15-20 seconds. The owner did not identify the defendant as the second robber until 4½ months later, when they were both in a courtroom.

To combat the owner's eyewitness identification of the defendant as the second robber, the defendant tried to admit into trial expert testimony regarding the unreliability of eyewitness identification. The defendant also requested that the trial court provide a cautionary jury instruction concerning eyewitness identification. The trial court refused to allow the expert testimony or provide a special jury instruction, and the defendant was convicted of aggravated robbery.

In addressing these issues, this court emphasized the unreliability of eyewitness identification and the importance of not convicting innocent defendants. The court also pointed to several cases in which innocent defendants have been wrongly convicted based on eyewitness identifications and to the methods which other countries and courts have adopted to prevent a defendant from being wrongly convicted. 230 Kan. at 393-97.

The *Warren* court affirmed *Reed*, finding that the admission of expert testimony regarding eyewitness identification is within the trial court's discretion and the refusal to admit such testimony will not be reversed unless an abuse of discretion occurs. The court found that in *Warren*, the reliability of the eyewitness identification was within the realm of the jurors' knowledge and experience. Thus, the *Warren* trial court did not abuse its discretion in refusing to admit expert testimony regarding the reliability of eyewitness identification. 230 Kan. at 394-97.

This court did find, however, that the trial court erred by not providing a cautionary jury instruction concerning eyewitness identification. 230 Kan. at 399-400. This court "concluded that any criminal action in which eyewitness identification is a critical part of the prosecution's case and there is a serious question about the reliability of the identification, a cautionary instruction should be given advising the jury as to the factors to be considered in weighing the credibility of the eyewitness identification testimony." 230 Kan. at 397. PIK Crim. 3d 52.20, the current cautionary jury instruction concerning eyewitness identification, was promulgated as a direct result of *Warren*.

In distinguishing between expert testimony and a cautionary jury instruction, this court made the following statement:

"After considering these cases and the literature on the subject, we have concluded that requiring trial courts to admit this type of expert evidence is not the answer to the [eyewitness identification] problem. We believe that the problem can be alleviated by a proper cautionary instruction to the jury which sets forth the factors to be considered in evaluating eyewitness testimony. Such an instruction, coupled with vigorous cross-examination and persuasive argument by defense counsel dealing realistically with the shortcomings and trouble spots of the identification process, should protect the rights of the defendant and at the same time enable the courts to avoid the problems involved in the admission of expert testimony on this subject." 230 Kan. at 395.

Two months after the *Warren* decision, this court decided *State v. Reynolds*, 230 Kan. 532, 639 P.2d 461 (1982). In *Reynolds*, the defendant appealed his conviction of aggravated robbery, alleging that the trial court improperly refused to authorize the payment of an expert to testify regarding eyewitness identification. This court interpreted *Warren* as standing for the proposition that "expert testimony on the subject of eyewitness identification is not admissible." 230 Kan. at 534. The court acknowledged that the eyewitness identification in *Reynolds* involved a cross-racial identification by a witness who was highly stressed when the brief encounter with the robber occurred. However, this court found such concerns were not enough to allow expert testimony regarding eyewitness identification. This court stated: "While these are important factors bearing on the witness's identification, they are fully capable of being elicited, and in fact were elicited, during other testimony. Accordingly, we find no abuse of discretion in the trial court's refusal to authorize the services of an expert on eyewitness identification." 230 Kan. at 535.

In *State v. Willis*, 240 Kan. 580, 731 P.2d 287 (1987), the defendant wished to include four new factors to the pattern cautionary jury instruction concerning eyewitness identification. When evaluating the eyewitness identification, the defendant wanted the jury to consider such factors as transracial identification ("own-race effect"), unconscious transference, after-acquired experience, and the "feedback" factor. This court found that the seven factors currently enumerated in the cautionary jury instruction were within the realm of a typical jury's understanding and that a jury does not need expert testimony to explain how to apply these factors. How-

ever, the *Willis* court found that including the factors requested by the defendant in the instruction would require expert testimony to explain to the jury how to apply the factors because the terms would be beyond the realm of a typical juror's knowledge. Noting the problems with expert testimony on eyewitness identification, this court affirmed the trial court's refusal to include these additional factors in the instruction. 240 Kan. at 585-86.

Another recent opinion from this court which addressed the issue of expert testimony regarding eyewitness identification is *State v. Wheaton*, 240 Kan. 345, 729 P.2d 1183 (1986). In *Wheaton*, the defendant was convicted of aggravated robbery. At trial, the defendant sought to admit expert testimony as to the accuracy of an eyewitness identification when the eyewitness was under stress at the time of the observation and when a cross-racial identification is involved. The defendant made clear that her expert would not indicate to the jury whether a particular eyewitness' identification was accurate. The trial court found the expert testimony was inadmissible under *State v. Warren*, 230 Kan. 385. The defendant appealed, contending that she was denied her Sixth Amendment right to obtain witnesses in her defense because the trial court refused to admit her expert's testimony regarding eyewitness identification.

In reviewing the district court's exclusion of the testimony, the *Wheaton* court addressed whether it should overturn *Warren* and *Reynolds* and allow expert testimony regarding eyewitness identification. In *Wheaton*, the defendant argued that most of the studies addressing eyewitness identification had been conducted since the *Warren* case was decided. Further, the defendant asserted that a growing trend allowing expert testimony on eyewitness identification had begun because cross-examinations, closing arguments, and cautionary jury instructions could not adequately cure the problems associated with eyewitness identifications. The defendant then pointed to several recently decided cases which admitted into evidence expert testimony regarding eyewitness identification. The *Wheaton* court acknowledged this recent trend toward admitting into trial expert testimony regarding eyewitness identification. The court then addressed several of the cases which allow such testi-

mony, including *United States v. Moore*, 786 P.2d 1308 (5th Cir. 1986), cited by the defendant in the current case, and *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983), one of the trend-setting cases. 240 Kan. at 349-51.

*Chapple* involved two eyewitnesses who were trying to identify some criminals they saw commit a murder. While looking at a photographic lineup, one of the eyewitnesses pointed to the picture of a man named Logan, who was not the defendant in the case, and said he resembled one of the murderers. This same witness was shown a photo lineup containing a picture of the defendant, but the witness did not identify the defendant as a murderer. Later, both of the eyewitnesses were shown another lineup which contained a picture of Perry, a man who had already been tentatively identified as one of the murderers, and a picture of the defendant, but it did not contain a picture of Logan. Both witnesses identified the defendant as one of the other murderers. The identification was made some time after the crime, and both the eyewitnesses had been smoking marijuana on the day of the crime. The defendant sought to present an expert witness at trial to testify about all the problems associated with these eyewitness identifications. The district court refused to allow this testimony. The Arizona Supreme Court reversed, finding that the trial court abused its discretion when it did not allow this testimony. 135 Ariz. at 290-92, 297.

In analyzing *Chapple*, this court made the following comments in *Wheaton*:

"The Arizona court stated it would not assume that ordinary jurors would be aware of the impact of the factors on eyewitness identification proffered by [the eyewitness identification expert]: (1) the 'forgetting curve' (forgetting occurs very quickly and then levels off, therefore, a prompt identification is more trustworthy than a delayed identification); (2) problems of 'unconscious transfer' (where a witness confuses a person seen in one situation with a person seen in a different situation); (3) the confidence expressed by the eyewitness has no relationship to the accuracy of the identification; (4) post-event information is frequently incorporated into identifications; and, (5) the 'feedback factor' (through discussions with other witnesses, the eyewitness can reinforce his or her individual identification). In ruling that the testimony of [the expert] was admissible, the court stated it was not opening the floodgates for expert evidence on the subject of eyewitness identification, but was allowing it under the peculiar facts before it. Cases subsequent to *Chapple* illustrate that the decision to allow general testimony as to

factors affecting eyewitnesses identification is within the sound discretion of the trial court and limit *Chapple* to the peculiar circumstances of the case, including the fact that the eyewitness identification was all that tied the defendant to the crime." 240 Kan. at 349-50 (citing *State v. Via*, 146 Ariz. 108, 704 P.2d 238 [1985], *cert. denied* 475 U.S. 1048 [1986]; *State v. Rodriquez*, 145 Ariz. 157, 700 P.2d 855 [1985]; *State v. Poland*, 144 Ariz. 388, 698 P.2d 183 [1985], *aff'd* 476 U.S. 147, 90 L. Ed. 2d 123, 106 S. Ct. 1749 [1986]).

After analyzing these cases, this court pointed to numerous cases which upheld the trial court's refusal to admit such testimony, including *United States v. Moore*, 786 F.2d 1308 (finding the trial court did not abuse its discretion by refusing to admit expert testimony regarding eyewitness identification because evidence of guilt was overwhelming and was not limited to a single eyewitness identification). See also *United States v. Daniels*, 64 F.3d 311, 315 (7th Cir. 1995), *cert. denied* 133 L. Ed. 2d 693 (1996) (finding that expert testimony on eyewitness identification is not permitted because it does not aid the jury in understanding facts, as this is an area in which the jury already has knowledge); and *People v. Kelley*, 631 N.Y.S. 2d 926, 927 (App. Div. 1995) (finding that the trial court properly excluded expert testimony regarding eyewitness identification because this subject "pertains to matters of common knowledge which are not beyond the ken of lay jurors," making expert testimony unnecessary).

After reviewing several cases which allowed expert testimony on eyewitness identification, the *Wheaton* court held that the district court did not abuse its discretion by refusing to allow expert testimony regarding eyewitness identification. In so holding, the court stated:

"The defendant argues most studies on the subject of eyewitness identification have been performed since the *Warren* decision in 1981. Whether or not that is true, we continue to believe that to allow expert testimony on the subject of the reliability of eyewitness testimony is not the answer to the problems surrounding eyewitness identifications. The cautionary instruction sets forth the factors for the jury to consider in evaluating the eyewitness' testimony. The defendant argues these instructions do not explain to the jury how to use the factors, *e.g.*, that threat of violence decreases the accuracy of the identification rather than increases its accuracy, as many laymen believe. Extensive cross-examination of the eyewitness and persuasive argument by defense counsel can highlight any inaccuracies which could result because the eyewitness was being threatened or was under stress.

*State v. Warren*, 230 Kan. at 395. . . . The trial court did not err in ruling the expert testimony on eyewitness identification was inadmissible." 240 Kan at 352-53.

The district court in this case properly refused to admit the testimony.

We continue to follow the above line of cases and hold that expert testimony regarding eyewitness identification should not be admitted into trial.

## PHOTOGRAPHIC LINEUP

On appeal, the defendant takes issue with the photographic lineup from which he was identified. Even though the victim had previously described her attacker as having dark skin, the defendant argues that he was the only dark-skinned man whose photo was in the second lineup from which he was identified. The defendant asserts that the lineup was unconstitutionally suggestive and that his identification from the lineup should have been suppressed. Further, the defendant argues that all of the victim's subsequent identifications of him after the lineup were not constitutionally reliable because of the procedure used and, as a result, his identification should have been suppressed. Thus, the defendant asserts that his convictions, which are based on unreliable identifications from an improper lineup procedure, violate due process and should be reversed.

At a pretrial suppression hearing, the defendant asked that the evidence concerning the lineup identification be excluded. The State countered that the lineup should not be suppressed even if the defendant was the only dark-complected male in the second lineup. It reasoned that when J.K. viewed the first lineup, which included three dark-complected men, and the mug books, which contained several pictures of Hispanic-looking males, J.K. did not identify anyone as her attacker simply because the individual was dark skinned. Thus, the State argued that the ultimate identification was constitutionally reliable. The trial judge denied the defendant's motion to suppress at the pretrial hearing, finding that identification based on the lineup passed the test of reliability.

On appeal, the defendant challenges this ruling. However, the defendant did not object to the admission of evidence concerning the second lineup at trial. When an unfavorable ruling on an evidentiary question prior to trial is received, a party must make a timely objection to such evidence when it is introduced at trial in order to preserve the issue for appeal. *State v. McIver*, 257 Kan. 420, Syl. ¶ 4, 902 P.2d 982 (1995). While the defendant argued at his sentencing hearing that the lineup procedure was invalid, he did not make this argument at trial. The defendant's failure to object at trial to the second photographic lineup, the procedures used to create the lineup, and his subsequent identification from the lineup precludes review of these issues on appeal. See *State v. Chiles*, 226 Kan. 140, 144, 595 P.2d 1130 (1979) (failure to object to photographic identification at trial pursuant to K.S.A. 60-404 precludes the assertion of error on appeal). In any event, we have viewed the second photographic lineup and agree with the trial court that it is not unduly suggestive and hold that the trial court did not err in finding the photographic lineup to be valid.

## TOE SUCKING

During the period of time J.K. was being attacked, her attacker twice sucked on her big toe as if he were sucking on a thumb. At trial, the State called the defendant's ex-wife to testify. She testified that she married the defendant in August 1987 and the two were married for 1 year. She also testified that she and the defendant had sex on a regular basis during their marriage. She further testified that, on occasion, the defendant would suck on her big toe as if he were sucking on a thumb while they were engaged in sexual conduct. She stated that this toe sucking occurred approximately five times during their 1-year marriage. The toe sucking was initiated by the defendant and not encouraged by his ex-wife.

In a pretrial motion in limine, the defendant requested that this evidence be excluded from the trial. The defendant argued that the evidence was not relevant and that it was character evidence which was being used in an improper manner. The State responded by arguing that the evidence was relevant to prove a habit of the defendant which identified him as the attacker. The district court

denied the defendant's motion. The State introduced the ex-wife's testimony at trial. The defendant objected to the introduction of the testimony at trial, but the trial court overruled the objection.

The admission or exclusion of evidence is within the sound discretion of the trial court. *State v. Rowell*, 256 Kan. 200, Syl. ¶ 2, 883 P.2d 1184 (1994). Thus, in reviewing the denial of a motion in limine, this court must use the abuse of discretion standard.

"Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Judicial discretion must thus be considered as exercisable only within the bounds of reason and justice in the broader sense and be considered abused only when it plainly overpasses those bounds." *State v. Lumbrera*, 257 Kan. 144, 148, 891 P.2d 1096 (1995).

The defendant contends that K.S.A. 60-447, a statute which concerns character evidence, applies to the toe sucking evidence and should have prohibited its admission at the trial. Under K.S.A. 60-447, specific nonconviction instances illustrating a defendant's character trait are inadmissible if they tend to prove a trait is bad and prove that a defendant conducted himself in a certain way on a specified occasion. This statute does not apply here because toe sucking is not a specific instance of a character trait. See *State v. Ralph*, 217 Kan. 457, 459, 537 P.2d 200 (1975) ("Drug addiction is not the type of 'character' trait dealt with in 60-447. It cannot be shown to be 'good' or 'bad', but is simply a medical fact."). Toe sucking is not the type of character trait contemplated by 60-447. Rather, the statute refers to character traits such as violent, gentle, trusting, or angry. Toe sucking is not necessarily good or bad, but is simply a fact. Toe sucking is not a specific instance of character trait which tends to prove the trait is bad. As such, K.S.A. 60-447 does not apply and cannot be used to exclude the toe sucking evidence.

The State contends that the toe sucking testimony was properly admitted under K.S.A. 60-449 and K.S.A. 60-450 as habit evidence. Under these statutes, evidence of specific instances of behavior is admissible to prove a habit and to prove that the defendant acted

in conformity with the habit on a certain occasion. However, evidence of such specific instances is only admissible if there are a sufficient number of the instances to warrant a finding of a habit.

The district court found that if the defendant participated in toe sucking with his ex-wife on several different occasions, then this constituted habit evidence. As such, the court found the ex-wife's testimony should be admitted to prove that the defendant had a habit of toe sucking which he probably acted in conformity with when he assaulted the victim and sucked on her toe. However, the district court made this ruling and overruled the defendant's objection to the evidence before it was clear just how many times the defendant had participated in toe sucking with his ex-wife. At trial, the defendant's ex-wife testified that the defendant sucked on her toe approximately five times during the course of their 1-year marriage.

Habit is defined as an action which is so ingrained in one's character that it becomes mechanical or automatic. *Pope v. Ransdell*, 251 Kan. 112, 129, 130, 833 P.2d 965 (1992); see *State v. Gonzales*, 245 Kan. 691, 700-01, 783 P.2d 1239 (1989). "Isolated or occasional instances of behavior will not prove habit." *Pope v. Ransdell*, 251 Kan. at 130. The defendant's ex-wife indicated that she had sex on a regular basis with the defendant during their 1-year marriage but only participated in toe sucking five times. This would indicate that toe sucking was not an automatic or mechanical reaction by the defendant whenever he engaged in sexual activity. The toe sucking evidence does not qualify as habit evidence. Thus, K.S.A. 60-449 and 60-450 are not applicable to this evidence and did not permit or exclude this evidence at trial.

Another statute which is often used to admit evidence of prior specific acts which are similar to the crime at issue is K.S.A. 60-455. This statute allows the admission of evidence that the defendant committed a prior crime or civil wrong to prove motive, opportunity, or identity. This statute does not apply to the toe sucking evidence because toe sucking is not a crime or civil wrong. See *State v. Sexton*, 256 Kan. 344, 349, 886 P.2d 811 (1994). In *Sexton*, the defendant was charged with killing the victim by strangulation. In defense, he argued that he and the victim were participating in

sexual bondage. According to the defendant, when he tied up the victim, he accidentally tied her up too tightly. Then she straightened out her legs, which pulled the ropes around her too tightly, and she accidentally strangled herself. At trial, the defendant's former wife was allowed to testify for the State that she and the defendant had engaged in sexual bondage 40 or 50 times over the course of their marriage. The State offered this testimony pursuant to K.S.A. 60-455 to prove lack of mistake or accident on the defendant's part when he tied the ropes around the victim too tightly. The court held that K.S.A. 60-455 did not govern the admissibility of this testimony because "sexual bondage between consenting adults is neither a crime nor a civil wrong under Kansas law." 256 Kan. at 349. Thus, this court held the testimony was admissible, independent of 60-455, as long as it was relevant and the trial court did not abuse its discretion in admitting it. Since toe sucking is not a crime or civil wrong, 60-455 does not apply to this evidence and does not govern its admissibility.

"Any relevant evidence having a tendency in reason to prove any material fact is admissible unless expressly excluded from evidence by the codified rules." *Williams v. Union Pacific Railroad Co.*, 204 Kan. 772, 780, 465 P.2d 975 (1970). None of the above exclusionary rules apply to this evidence. Thus, the evidence is admissible as long as it is relevant. "The question of whether evidence is too remote to be relevant is left to the discretion of the trial judge, whose decision will not be disturbed unless a clear abuse of discretion has been demonstrated." *State v. Milo*, 249 Kan. 15, 26, 815 P.2d 519 (1991).

The defendant contends that the trial court abused its discretion in admitting this evidence because it is not relevant. Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b).

"'Relevancy is more a matter of logic and experience than of law. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence, or if it has any tendency in reason to prove any material fact.'" *State v. Sexton*, 256 Kan. at 349 (quoting *State v. Baker*, 219 Kan. 854, Syl. ¶ 2, 549 P.2d 911 [1976]); see K.S.A. 60-401(b).

According to the defendant, there is no relevance between what type of sexual conduct he consensually engaged in with his adult married wife and the type of conduct an attacker forces on a young girl in a street attack. The defendant asserts that there is no rational basis for the conclusion that rapists like to do the same things with their victims that they do or did with their wives.

On the other hand, the State contends that the toe sucking evidence was relevant. The perpetrator in this case sucked on the victim's big toe as if he were sucking on a thumb. The toe sucking testimony by the defendant's ex-wife indicated that the defendant had exhibited this same behavior in the past. From this evidence, the State asserts that the inference can be made that the defendant, who engaged in toe sucking in the past, was the same person who attacked the victim and engaged in toe sucking when he attacked her. According to the State, the inference that the defendant is the man who attacked the victim is more probable with the admission of the toe sucking evidence than it would be without it. We agree. The toe sucking testimony by the defendant's ex-wife is relevant. Thus, the district court did not abuse its discretion in admitting this testimony into evidence.

Affirmed.