No. 77,538

STATE OF KANSAS, *Appellee*, v. ĜLENN A. HEATH, JR., *Appellant*.

(957 P.2d 449)

Opinion filed April 17, 1998.

*Mary Curtis*, assistant appellate defender, argued the cause and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Joan M. Hamilton*, district attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Two-year-old Cain Baker died from internal bleeding caused by blunt trauma. Glenn A. Heath, Jr., the live-in boyfriend of Cain's mother, was charged with and convicted of first-degree felony murder and abuse of a child. He appeals, claiming that: (1) his convictions of both felony murder and the underlying felony of abuse of a child constitute double jeopardy and violate his due process rights; (2) the trial court erred in failing to instruct the jury on the lesser included offenses of involuntary manslaughter, child endangerment, and battery; (3) the trial court erred in allowing the county coroner to testify regarding battered child syndrome; (4) the trial court erred in admitting evidence of prior abuse of Cain;

(5) he is entitled to a new trial based upon prosecutorial misconduct; (6) the trial court erred in failing to remove two potential jurors from the panel for cause; (7) the trial court erred in permitting Cain's mother to be present during the trial; (8) the trial court erred in failing to suppress the defendant's statements to detectives; (9) the trial court erred in imposing a departure sentence for abuse of a child and running such sentence consecutive to the sentence for first-degree felony murder; and (10) the cumulative trial errors denied him a fair trial. Because of the fact-sensitive nature of some of the alleged errors it is necessary to set forth a detailed statement of the case.

Prior to trial, the defendant filed a motion to suppress statements he made to Detective Mills of the Topeka Police Department. Upon hearing, the State presented the testimony of Corporal Scott Conklin of the Topeka Police Department. Conklin testified that on Saturday, October 21, 1995, he was called to Stormont-Vail Hospital. When he arrived he was advised by Jan Hay, the emergency room charge nurse, that "the father" of Cain Baker had called 911 and said that Cain was not breathing. Hay also related that Cain's maternal grandmother had told emergency room personnel to check into the defendant because of prior instances of abuse. Conklin testified that he went into the trauma room to view Cain's injuries and then went into the family waiting room to talk to the defendant. His conversation with the defendant lasted approximately 15 to 20 minutes.

According to Conklin, the defendant stated that he had been taking care of Cain while Cain's mother was at work. The defendant told Conklin that Cain had gotten up at 8:30 that morning and the defendant was feeding him breakfast when Cain began throwing up. The defendant put Cain in the bathtub to clean him up but Cain threw up once in the bathtub and once more when the defendant was drying him off. Cain then told the defendant that he was tired. Cain was running a temperature so the defendant gave him some Tylenol and Amoxicillin and put him to bed. According to Conklin, the defendant then stated that he watched television for approximately 20 to 30 minutes and then went to check on Cain. The defendant found Cain lying in a pool of vomit. Cain was

not breathing and would not wake up, so the defendant dialed 911. The defendant stated that Cain had displayed no signs of being sick the previous night.

After checking on Cain's condition, Officer Conklin went back to the family waiting room to talk with the child's mother, Rhonda Pardekooper. Conklin stated that he had no reason at that time to suspect wrongdoing. However, he called dispatch and asked to have an officer sent to Cain's address because it was not known what might have caused Cain's injury and he wanted to make sure that the house was not disturbed. Conklin also talked to other family members and to Cain's doctor, who told him that Cain had suffered an injury to the artery in his abdomen that appeared to have been inflicted by a blunt object. Conklin testified that he then introduced the defendant and Pardekooper to Detective Caviness. He also asked for permission to search the defendant and Pardekooper's residence, and consent was given.

Detective Sergeant Randy Mills arrived at the hospital to start an investigation. Cain's doctors informed Mills that the injury was serious, that the child might die, that it would take a blow similar to that from a broom handle to cause the injury, and that a child would not be capable of inflicting such a blow on his own. Mills then went to talk to the defendant and Pardekooper to obtain permission to look through the residence to see if anything there could help determine what happened.

Mills told the defendant and Pardekooper that he wanted to talk to them and thought it would be more efficient to talk at the police station. He offered to give them a ride to the station and back, and they agreed. At the police station Mills talked to Pardekooper first. The conversation lasted about an hour, during which time the defendant was in the lobby of the police station. Pardekooper told Mills that on Friday the defendant picked up Cain from day care, that the defendant and Cain then picked her up from her job around 8:30 p.m., and that they all went home and went to bed shortly thereafter. The next morning, Cain and the defendant dropped her off at work, and she assumed they then returned home.

Mills then talked to the defendant. The defendant told Mills essentially the same story he had earlier told Conklin, except that the defendant added that when he took Cain into the bathroom to clean him up he accidentally bumped Cain's head on the sink. Mills testified that he told the defendant that he did not totally believe the story, at which point the defendant told Mills that he would tell him "the truth." The defendant then proceeded to tell Mills that after he had cleaned up Cain from the first vomiting, Cain threw up again. The defendant indicated that he got frustrated and shoved Cain in the back. Cain landed on a rocking chair.

At that point, Mills brought in Detective Caviness and they read the defendant his *Miranda* rights. Mills testified that after the defendant was advised of his rights, the defendant related the same story of shoving Cain. On cross-examination, Mills admitted that he never specifically told the defendant that he was free to leave at any time during the trip to the police station and the resulting questioning.

The trial court denied the defendant's motion to suppress his statements, concluding that the defendant had suffered no significant deprivation of freedom prior to his relating the story to Mills.

The defendant also filed a motion in limine to prohibit the State from introducing evidence of battered child syndrome on the grounds that it was not helpful to the jury or generally accepted in the scientific community. After hearing, the court determined that the evidence would be admissible, possibly subject to a *Frye* examination. However, battered child syndrome testimony was admitted at trial without considering foundational requirements set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

The State asked that Pardekooper to be present throughout the trial notwithstanding that she would be a witness for the State. The defendant objected on the grounds that being present during the trial would influence Pardekooper's testimony. The court ruled that Pardekooper, as the mother of Cain, could be present throughout the trial but any other family members who were witnesses could not be.

During voir dire examination of potential jurors, the defendant moved to strike two members of the panel for cause. Both motions

were denied. However, the two members were later struck with peremptory challenges by the defendant.

The State called as its first witness Dr. James Hamilton, a surgeon at Stormont-Vail. He testified that when he first observed Cain, he was unresponsive and had a quarter-size bruise on his abdominal wall. Cain was immediately taken into surgery.

During surgery, Dr. Hamilton found that Cain had suffered a large tear in the mesentery membrane of the stomach, approximately 12 centimeters by 8 centimeters. Cain had also suffered a punctured intestine and was bleeding internally. The cause of the injury, according to Dr. Hamilton, was blunt trauma such as that caused by a broom handle or hammer. According to Dr. Hamilton, the force necessary to cause such an injury would be comparable to falling off of a two-story building onto the bottom of the leg of a chair. Dr. Hamilton testified that body weight alone would not cause such an injury and, in fact, it would be difficult to cause such an injury in a car wreck. Dr. Hamilton also testified that judging from the condition of Cain, the injury had occurred between 6 p.m. on Friday and 10 a.m. on Saturday.

Michael Troth, an emergency medical technician for the Topeka Fire Department, testified that he had been sent by 911 to the residence and performed CPR in an attempt to revive Cain. While doing so, he noted several bruises on Cain's body.

Officer Mills then related the pretrial statement made by the defendant to the jury. He further stated that after the defendant had made the statements, the defendant asked to see Pardekooper. When Pardekooper came in, the defendant stated to her, "I got frustrated," at which point she got angry at him and stated that they should have gotten attorneys earlier when they had talked about it. Mills also stated that prior to the defendant's arrest, Pardekooper had not cried and seemed to be emotionless.

Dr. Edward Patrick, a pediatrician, also testified on behalf of the State. He stated that he was called into the intensive care unit on Saturday, October 21, to help treat Cain. He noticed some bruising on Cain's body while treating him. Dr. Patrick testified that despite the efforts of the hospital staff, Cain was never completely stabilized and that he pronounced Cain dead at 3:34 p.m. on October

23. During the time he was at the hospital he overheard Pardekooper in the waiting room. Pardekooper told her mother at that time, "He did it."

Jan Hay, a registered nurse employed at Stormont-Vail Hospital, testified that she was on duty when Cain was brought in and noticed several bruises of varying age. She stated that both the defendant and Pardekooper were tearful when she saw them at the hospital.

Courtney Leutje, a friend of Pardekooper's sister, Melissa Carroll, then testified that she saw Cain on October 15 when Carroll and her child were visiting from Emporia. Leutje stated that she and her daughter, as well as Carroll and her child, went to visit Pardekooper. Carroll took Cain back to Emporia for a visit. While at Pardekooper's, Leutje noticed a bruise on Cain's ear as well as some other bruises.

Carroll testified that when she took Cain to Emporia for a visit on October 15, she saw a bruise on his ear. She checked his body for more bruises but found none. However, she did notice a slight bruise under his right eye. Carroll testified that she returned Cain on Wednesday, October 18. On Saturday, October 21, Pardekooper called and told her that Cain was in the hospital. Carroll stated that Pardekooper's voice was quivering when she called.

Sara O'Brien, Cain's babysitter, testified that she cared for Cain on Friday, October 20 and that Cain did not seem in pain or injured that day, nor did he have any accidents during the day. Rachel O'Brien, Sara's sister, also testified that she saw Cain on October 20 and he was not injured or in pain. Eric Weems, a co-worker of the defendant and also the father of Sara O'Brien's child, was with the defendant when he picked up Cain from the babysitter. Weems stated that Cain seemed in good health at that time.

Tim Garcia, a neighbor of the defendant and Pardekooper, testified that his sons played with Cain in the early evening on Friday, October 20. Garcia testified that Cain was not suffering from any problems at that time. Garcia also testified that when he heard from the defendant about Cain being taken to the hospital, he volunteered to pick up Pardekooper from work. According to Garcia, when he picked up Pardekooper, she did not seem upset and

told him that Cain gets sick all the time and that the defendant overreacts.

Brandon Garcia, the 11-year-old son of Tim Garcia, testified that he and his brother took Cain to the park in the early evening on Friday, October 20. While at the park, Cain fell off his tricycle and bumped his head and also went head-first down the slide and bumped his stomach. However, he stated that Cain seemed okay and was not bleeding or crying. He testified that Cain got upset later that evening because the Garcias were going to eat pizza and he was not allowed to go with them.

Pardekooper testified that she had been living with the defendant for approximately 8 months before the incident. On Friday night she called the defendant to come pick her up at work. The defendant told her that Cain was asleep and Pardekooper told him to wake Cain up and bring him along. According to Pardekooper, she said hello to Cain when she got into the defendant's truck and although Cain did not answer, she believed that he was awake. She testified that when they arrived at home, the defendant volunteered to get Cain out of the truck and put him to bed. She was tired from work and did not object to the defendant's suggestion. She testified that the defendant then put Cain to bed and she and the defendant watched television for a short time, then they both also went to bed.

Pardekooper got up late on Saturday; Cain was sleeping when she went to work. She did not check on Cain because she was running late, although she did look into his room right before she left. Cain appeared to be sleeping with his head turned towards the wall. Pardekooper testified that she and the defendant left Cain at the residence and the defendant drove her to work.

Later that day, the defendant called her to tell her that Cain was sick. Pardekooper was not worried because Cain had been sick before, and she felt that the defendant could handle the situation. She told the defendant to give Cain some Tylenol and put him to bed. Pardekooper testified that the defendant called her three to five times that morning. On the last phone call, he informed her that Cain had stopped breathing and that he had dialed 911 and that the ambulance attendants had aspirated Cain. She asked the

defendant to pick her up; later, Garcia came to take her to the hospital.

Pardekooper testified that when she arrived at the hospital and saw Cain, she became upset. Later, she and the defendant went out to the defendant's truck and had cigarettes. The defendant told her he did not know what had happened to Cain. When they returned to the hospital, a doctor told her that Cain had received a blow to the stomach. Garcia then told her that she needed to get the defendant a lawyer.

Pardekooper stated that when she later talked to the defendant at the police station, he told her that he had pushed Cain. She immediately told him to shut up because she did not want to hear any more and did not believe that he had injured Cain. She then told the defendant that they should have gotten a lawyer. Pardekooper testified that she did not want to believe that the defendant was capable of hurting Cain. She refused to allow Detective Mills to take her back to the hospital and instead rode back to the hospital with the defendant's mother.

Pardekooper stated that she later visited the defendant in jail where he told her that he pushed Cain into a chair. She admitted that she had originally been charged with child endangerment but the charges were later dropped. Pardekooper stated that at first, she refused to talk to police because she still did not believe that the defendant had injured Cain and she was trying to protect him.

Pardekooper confirmed that in March or April 1995, the Department of Social and Rehabilitation Services (SRS) investigated a report made by her mother that Cain had some suspicious bruises. She also confirmed that in July Cain had suffered a broken leg in what the defendant told her was a playground accident.

Dorothy Smart, Pardekooper's mother, also testified. She stated that in March 1995, Carroll and her husband brought Cain to stay with her and Cain was badly bruised. Smart called SRS to investigate. Pat Eisenbarth, a social worker for SRS, testified that SRS opened a case on Cain when his grandmother brought him to the Olathe Medical Center to be treated for bruises. Dr. Asbury, a doctor at Olathe Medical Center, had earlier testified that when he saw Cain, Cain had several bruises, some of differing age. Ei-

senbarth testified that when she talked to Pardekooper, Pardekooper told her that the defendant, not Pardekooper, had been home with Cain when the bruises occurred. She also talked to the defendant, and in her mind his story was not consistent with the medical history. Eisenbarth made a finding of physical abuse, perpetrator unknown.

Eisenbarth testified concerning a second incident wherein she made a finding of confirmed neglect on the part of the defendant. Eisenbarth indicated that the defendant told her that Cain had been bruised when the defendant was driving his truck and stopped suddenly. The defendant indicated that Cain had not been wearing his seat belt.

Eisenbarth also testified that she later commenced an investigation after learning on July 5, 1995, that Cain had suffered a broken leg. She stated that she had talked to Pardekooper, and again Pardekooper told her that the defendant was with Cain when the broken leg occurred. Eisenbarth stated that she was unable to confirm physical abuse because the medical opinion was that the injury could have been an accident, as the defendant maintained.

The final witness for the State was Shawnee County Coroner Dr. George Thomas. Dr. Thomas, over objection, testified that based upon his autopsy findings, Cain suffered from battered child syndrome. Dr. Thomas stated that his findings showed evidence of recent injury as well as old injury, including scarring in the abdomen and upper lip. Dr. Thomas testified that battered child syndrome is a recognized medical term. According to Dr. Thomas, the major diagnostic feature of battered child syndrome is a discrepancy between the history given by the caretaker and the physical findings, as well as no injury occurring during the time the child is in a protected environment. Dr. Thomas stated that in actual accidents, the caretaker usually gives a consistent story that does not change over time and is consistent with the autopsy findings. He cautioned however, that it is impossible to tell who battered Cain by looking at the injuries. Further, he stated that the reaction of an individual does not provide much help in identifying the batterer. On cross-examination, Dr. Thomas stated that from his autopsy he could not tell who had battered Cain.

Following the testimony of Dr. Thomas, the defendant moved for a mistrial on the grounds that the testimony on battered child syndrome, as well as the testimony of Pat Eisenbarth, was prejudicial in that its only value was to establish the defendant's propensity to batter Cain. The motion was denied.

The defendant testified at trial. His story conflicts with the testimony of Pardekooper. According to the defendant, on Friday evening, October 20, Cain seemed in good health although a little fussy. The defendant took Cain to pick up Pardekooper at work. On the way home, they stopped at Dillon's to pick up some food for Cain. The defendant stated that Pardekooper "had an attitude" during this time possibly because she had just gotten off work.

According to the defendant, Pardekooper, not he, took Cain into the house and put him to bed. The defendant stated that he unpacked the groceries during this time. After Cain was in bed, the defendant and Pardekooper drank daiquiris, and the defendant then left the residence to get cigarettes. The defendant testified that when he returned, he watched television and fell asleep on the couch. Pardekooper then woke him up and they went to bed.

The next morning, they woke up late and Pardekooper was upset that he or she had not set the alarm. The defendant testified that while Pardekooper was getting ready for work, he went outside to check the oil in his truck. After dropping Pardekooper off at work, he went home and gave Cain breakfast. At that point, according to the defendant, Cain vomited. The defendant called Pardekooper, and she told him to give Cain Tylenol and put him to bed. The defendant testified that he gave Cain a bath and Cain vomited again. The defendant put Cain to bed and left to go to the store to get soda and ice cream. When he came back home he looked in on Cain and then watched television. He then heard a noise coming from Cain's room. The defendant stated that he brought some soda into Cain's room and saw that Cain had vomited again. He gave the soda to Cain and set him up in bed but Cain then fell over. He then called Pardekooper, who told him to call Ask-A-Nurse. Instead, the defendant called 911 because he thought Cain was going into a seizure.

The defendant testified that while waiting for the ambulance to arrive, he picked Cain off the floor, attempted CPR, and pushed on Cain's stomach in an attempt to revive him. After the ambulance left, the defendant stated that he went to pick up Pardekooper but she had already left work. He then remembered that Garcia told him he would pick Pardekooper up from work. The defendant went to the hospital where medical personnel and the police questioned him about how Cain got certain bruises; however, no one would tell him what was wrong with Cain. At some point, he went out to his truck with Pardekooper to smoke a cigarette. He asked Pardekooper about the bruises, and she told him that they ought to get an attorney. They were then interrupted by a security guard and another person who told them that the detectives wished to talk to them upstairs.

The defendant testified that he did not learn of Cain's injury until after he had been arrested. He stated that he went to the police station and was interviewed by Detective Mills. According to the defendant, he told Mills three times that he did not know what happened to Cain but Mills called him a liar. He then asked Mills to take him back to the hospital but Mills told him that "it would be painful" if he tried to leave. The defendant testified that Mills kept asking questions about whether he or Pardekooper had bruised Cain. Finally, he told Mills that he had pushed Cain. Mills asked where he had pushed Cain and the defendant told him he was by the bathroom door. Mills then asked what Cain had landed on and the defendant stated that Cain had hit a rocking chair. The defendant testified that he said these things because he thought he was protecting Pardekooper. He also stated he was feeling guilty because he still thought at this point that Cain was in the hospital because Cain had trouble breathing. The defendant believed that if he had not gone to the store and left Cain alone, Cain would have been okay. The defendant denied hurting Cain.

Christopher Kirkham, a co-worker of Pardekooper, testified that after receiving the telephone call from the defendant that Cain had stopped breathing, Pardekooper did not seem upset. On cross-examination, the prosecutor attempted to ask Kirkham whether he had ever seen the defendant in a rage. The defendant immediately

objected on the grounds that it was beyond the scope of direct and also a violation of the motion in limine, and demanded a mistrial. The trial court denied the motion for mistrial but sustained the objection and admonished the prosecutor, stating that the question was well beyond the scope of direct.

The defendant also presented the testimony of Ellen Godfrey, an employee of the Kansas Department of Health and Environment's WIC program. Godfrey stated that the WIC program is a nutritional program for women, infants, and children and presented a voucher which indicated that Pardekooper had made a purchase at Dillon's on Friday, October 20, thus supporting the defendant's contention that the defendant, Pardekooper, and Cain had stopped at Dillon's on the way home.

The jury found the defendant guilty of both felony murder and abuse of a child. The State filed a motion for a departure sentence on the abuse of a child charge. The defendant was sentenced to a mandatory life sentence on the felony-murder charge, and the trial court departed from the guidelines and sentenced the defendant to 68 months on the abuse of a child conviction. The trial court ordered that the sentences be run consecutively.

We now turn to the issues raised by the defendant.

## (1) CONVICTION FOR BOTH FELONY MURDER AND ABUSE OF A CHILD

The defendant's first contention is that he cannot be convicted of both felony murder and the underlying felony of abuse of a child because such convictions violate double jeopardy and his right to due process. He contends that abuse of a child, under the facts of the case, necessarily merges into the crime of murder.

We have recently addressed this question in *State v. Smallwood*, 264 Kan. 69, 955 P.2d 1209 (1998). In *Smallwood*, we concluded that where only one act forms the basis for both the abuse of a child charge and the homicide, the abuse of the child offense merges with the offense of felony murder and convictions for both first-degree felony murder and abuse of a child violate the constitutional prohibition against double jeopardy.

Our decision in *Smallwood* controls. The defendant should not have been convicted of both abuse of a child and felony murder, and the trial court erred in imposing consecutive sentences based on those convictions. The defendant's conviction for child abuse is reversed, and his sentence for that offense is vacated.

## (2) REFUSAL TO INSTRUCT ON LESSER INCLUDED OFFENSES

The defendant contends that the trial court erred in failing to instruct the jury on involuntary manslaughter, child endangerment, and simple battery as lesser included offenses of felony murder and abuse of a child. The defendant argues that because the child abuse in this case constituted one act which also caused the murder, his intent in committing the murder should be at issue, and therefore he is entitled to an instruction on lesser included offenses.

The defendant's argument is contrary to established Kansas law. The rule in Kansas with regard to felony murder is that the jury need not be instructed on lesser offenses unless evidence of the underlying felony is weak and inconclusive. *State v. Altum*, 262 Kan. 733, 738-39, 941 P.2d 1348 (1997). In *Altum*, the defendant was convicted of felony murder from an underlying count of abuse of a child in the beating death of a 14-month-old child. Altum contended that the jury should have been instructed on lesser included offenses. We noted that the only intent required for the offense of abuse of a child is the act of hitting or hurting; the type and nature of the injuries did not permit a reasonable conclusion that the injuries were accidentally inflicted and the only question was, therefore, who had abused the child. 262 Kan. at 737-38. We concluded:

"[I]f Altum perpetrated the child abuse, his role in that felony would supply the elements of deliberation and premeditation, both of which must be absent from second-degree murder and manslaughter. Thus, either the child abuse was perpetrated by Altum and he necessarily is responsible for the murder, or he did not perpetrate the child abuse where the child's death was caused and is not guilty of any degree of homicide." 262 Kan. at 739.

The situation in this case is similar to that in *Altum*. The medical evidence in this case indicated that Cain sustained blunt trauma to

the abdomen. The extent of the injury did not permit a reasonable conclusion that the injury occurred accidentally. The only question, therefore, was whether the defendant was responsible for the blow. Such a blow would constitute child abuse, and as a result the evidence of the underlying felony was neither weak nor inconclusive. The trial court did not err in failing to instruct on lesser included offenses.

Moreover, the defendant could not have been convicted of any lesser degree of homicide as the commission of abuse of a child would supply the elements of deliberation and premeditation, both of which must be absent from second-degree murder and manslaughter. *Altum*, 262 Kan. at 737. Further, the defendant could not reasonably be convicted of either endangerment of a child or battery, because the evidence indicates that the blow struck would constitute abuse of a child and, thus, felony murder. Therefore, either the defendant struck the blow that resulted in Cain's death, in which case he is guilty of felony murder, or he did not, in which case he is not guilty.

## (3) BATTERED CHILD SYNDROME

The Shawnee County Coroner, Dr. Thomas, testified on behalf of the State regarding battered child syndrome. The defendant contends that: (a) Dr. Thomas was not qualified as an expert; (b) the testimony was not necessary or helpful to the jury; (c) the testimony invaded the province of the jury, and (d) the admission of the evidence without a *Frye* test was error.

### a. Dr. Thomas' qualifications

We have held that in order to be qualified as an expert, a witness must be skilled or experienced in the profession to which the subject relates and qualified to impart to the jury knowledge within the scope of his or her special skill and experience that is otherwise unavailable to the jury from other sources. *State v. Willis*, 256 Kan. 837, 839, 888 P.2d 839 (1995). It is within the trial court's discretion to determine the qualifications of an expert witness, and a trial court's determination will not be reversed on appeal absent a showing of an abuse of discretion. 256 Kan. at 839. Judicial discretion

is abused only when no reasonable person would take the view adopted by the trial court. *State v. Stallings*, 262 Kan. 721, Syl. ¶ 6, 942 P.2d 11 (1997).

Although Kansas courts have admitted expert testimony on battered child syndrome in two reported cases, neither case dealt with the issue of the qualifications of the expert witness. See *State v. Rowell*, 256 Kan. 200, 207, 883 P.2d 1184 (1994); *State v. Sparks*, 217 Kan. 204, 206, 535 P.2d 901 (1975). Other courts, however, have held that battered child syndrome is an accepted medical diagnosis and has been held to be "within the area of expertise of physicians whose familiarity with numerous instances of injuries accidentally caused qualifies them to express with reasonable probability that a particular injury or group of injuries to a child is not accidental or is not consistent with the explanation offered therefor." *State v. Mulder*, 29 Wash. App. 513, 515, 629 P.2d 462 (1981). Thus, expert testimony on the subject has been allowed from such witnesses as pediatricians, radiologists, pathologists, and emergency room physicians. See *People v. Gordon*, 738 P.2d 404, 406 (Colo. App. 1987); *Commonwealth v. Azar*, 32 Mass. App. 290, 301-02, 588 N.E.2d 1352 (1992); *State v. Jurgens*, 424 N.W.2d 546, 549 (Minn. App. 1988); *State v. Best* 89 S.D. 227 238-39, 232 N.W.2d 447 (1975). In *Rowell*, 256 Kan. at 207, the testifying expert was a pediatrician while in *Sparks*, 217 Kan. at 206, the testifying expert was an emergency room surgeon.

Dr. Thomas testified that as Shawnee County Coroner, he was trained in forensic pathology. He testified that forensic pathology involves taking the principles of pathology and using them to investigate deaths in cases ranging from accidents to suicides to homicides to sudden, unnatural deaths. He further testified that he had performed over 2,000 autopsies. Under these circumstances, Dr. Thomas is one especially qualified to "express with reasonable probability that a particular injury or group of injuries to a child is not accidental or is not consistent with the explanation offered therefor." See *State v. Mulder*, 29 Wash. App. at 515. Contrary to the defendant's assertions, the trial court did not err in allowing Dr. Thomas to testify as an expert on battered child syndrome.

## b. Was the testimony necessary and helpful to the jury?

The defendant argues that the testimony of battered child syndrome served no other purpose than to prejudice him because it was obvious from the severity of the injury that the injury was not accidental. Thus, the only value of the testimony was evidence of the defendant's propensity to commit child abuse.

The basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case and to be admissible, expert testimony must be helpful to the jury. *State v. Lumbrera*, 257 Kan. 144, 157, 891 P.2d 1096 (1995). Where the normal experience and qualifications of laypersons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible, 257 Kan. at 157. The admissibility of expert testimony lies within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. 257 Kan. at 158.

The defendant's contention that the testimony concerning battered child syndrome was not necessary or helpful to the jury ignores one of the purposes of such testimony, which is to show that the child died at the hands of another rather than by accident and that the other person inflicted the injuries intentionally. See *Estelle v. McGuire*, 502 U.S. 62, 68, 116 L .Ed 2d 385, 112 S. Ct. 475 (1991) (regarding relevance of battered child syndrome). The defendant argues that such testimony is unnecessary since the severity of the injury which caused Cain's death made it obvious to the jury that the injury was not accidental. However, as the United States Supreme Court pointed out in *Estelle*, it is the duty of the prosecution to prove each essential element of the crime beyond a reasonable doubt. See 502 U.S. at 69.

It is true that the severity of the injury in this case raised a strong inference that the death was not accidental, but it was still incumbent upon the State to prove the crime. The support provided by the battered child syndrome diagnosis helped the jury to understand the importance of the prior injuries as evidence that the fatal injury to the child was not accidental. Accordingly, the defendant fails in his claim that admission of the evidence constituted an abuse of discretion.

### c. Did the testimony invade the province of the jury?

The defendant argues that because Dr. Thomas was asked to give his expert opinion on whether Cain's injuries were consistent with the story told to the police by the defendant, Dr. Thomas was actually passing on the credibility of the defendant. He further argues that by opining that Cain's latest injuries were the result of intentional abuse, Dr. Thomas invaded the province of the jury.

We have held that an expert's opinion is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. *Lumbrera*, 257 Kan. at 157. Although an expert may give his opinion on an ultimate issue, the expert may only do so insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material in evidence. 257 Kan. at 157.

On the question of whether Dr. Thomas gave an opinion as to the credibility of the defendant, it is important to look at the actual questions asked of Dr. Thomas and the answers that he gave in response to those questions. Dr. Thomas was asked a series of questions pertaining to measurements he had taken of the injuries to Cain and the dimensions of the rocking chair found in the defendant and Pardekooper's residence. He was then asked, given those measurements, to give his opinion as to whether the weight of Cain coupled with the speed at which he might have fallen, could have made the injuries observed in the autopsy. Dr. Thomas opined that the weight and speed could not have done so. Nowhere did Dr. Thomas give his opinion that the defendant was not credible. Instead, his testimony simply demonstrated that based on the evidence, Cain's injuries were not consistent with being pushed into a rocking chair. Moreover, the defendant himself testified that he was attempting to protect Pardekooper when he told Detective Mills that he pushed Cain and that he had not hurt Cain.

The defendant also argues that because Dr. Thomas gave an opinion that the old injury and the new injury were typical of child abuse, Dr. Thomas invaded the province of the jury because there was no evidence that both the old and new injuries were inflicted

by the same person. The United States Supreme Court, commenting on battered child syndrome in *Estelle*, stated that "[w]hen offered to show that certain injuries are a product of child abuse, rather than accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who might have inflicted those injuries." 502 U.S. at 68. In this case, the old injuries, according to Dr. Thomas, established that Cain was a battered child. Based upon his knowledge and experience, Dr. Thomas' opinion as to whether any new injuries were consistent with that syndrome was admissible.

### d. Is battered child syndrome subject to the *Frye* test?

The defendant also contends that the trial court erred in admitting evidence on battered child syndrome without a *Frye* test. He contends that without a *Frye* test, the evidence should not have been admitted.

Kansas has long recognized that the test for the admittance of scientific evidence is that applied in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). See *State v. Hill*, 257 Kan. 774, 783, 895 P.2d 1238 (1995). Under the *Frye* test, before expert scientific opinion evidence may be received in evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. 257 Kan. at 783. However, where such evidence is generally accepted as reliable, it is admissible without the necessity of a hearing under *Frye*. See *State v. Witte*, 251 Kan. 313, 329, 836 P.2d 1110 (1992).

The defendant contends that a *Frye* hearing should have been held on battered child syndrome. However, other courts addressing this issue have concluded that battered child syndrome is generally accepted as reliable. In *United States v. Boise*, 916 F.2d 497, 503-04 (9th Cir. 1990), the court noted that other circuit and state courts have recognized that battered child syndrome is an accepted medical diagnosis and have approved its use. *Boise* concluded that "[b]ecause battered-child syndrome has gained general judicial recognition, the proponent was not required to qualify it under *Frye*." 916 F.2d at 503. See also 1 Myers, Evidence in Child Abuse and Neglect Cases § 4.6 (3d ed. 1997) (holding that battered child

syndrome is not novel scientific evidence and is not subject to qual-
ification under *Frye* or *Daubert v. Merrell Dow Pharmaceuticals,
Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 [1993]).

While Kansas has never addressed the issue, we believe *Boise* as
well as the authority quoted above provide a sound basis for con-
cluding in this case that battered child syndrome is not subject to
qualification under *Frye*. We, therefore, hold that because battered
child syndrome has gained wide judicial acceptance and is not
novel scientific evidence, it is not subject to qualification under
*Frye*. The trial court did not err in admitting it without a *Frye*
hearing.

### (4) EVIDENCE OF PRIOR ABUSE

The trial court admitted evidence of the prior abuse of Cain.
The defendant argues that the admission was error because it was
not necessary as foundation for Dr. Thomas' expert testimony and
was not probative of any issue in the case. The defendant also
argues that its prejudicial effect far outweighed its probative value.

The admission of evidence is generally governed by relevancy;
the exclusion of evidence lies within the sound discretion of the
trial court. *State v. Knighten*, 260 Kan. 47, 53, 917 P.2d 1324
(1996). Under K.S.A. 60-445, the trial court may exclude evidence
when its probative value is outweighed by its prejudicial effect. 260
Kan. at 53. In this case, evidence of prior instances of prior injuries
to Cain were admitted as a basis for Dr. Thomas' conclusion that
Cain suffered from battered child syndrome and also to support
the theory that Cain was being abused. The defendant contends
that such information was irrelevant because Dr. Thomas testified
that the evidence from the autopsy itself was all he needed in order
to conclude that Cain's injury was not accidental.

A review of the record shows that when asked how he made a
determination as to whether Cain was a battered child, Dr. Thomas
replied:

"Based upon my autopsy findings, the autopsy findings showed evidence or
recent injuries, which were unexplained injuries, also showed evidence of old
injury. When we looked at the abdomen microscopically, we found evidence of
old injuries, some scarring. Also, there was an old injury inside the upper lip. And

based upon those findings. *Of course, also, if one needed to, one could also add in the fact that I knew something about prior history.*" (Emphasis added.)

Later, Dr. Thomas was asked by the State whether it would have made a difference in his diagnosis if he had not known about Cain's prior injuries, to which he replied:

"No, there was enough injury in the autopsy, both old and recent, and there was a discrepancy in the explanation for the injuries or there was no explanation so that I would have made the same diagnosis."

The above passages convey that while it was not vitally important to Dr. Thomas' opinion that the prior evidence of abuse be introduced, it was a factor that he considered and bolstered his expert opinion. The defendant contends that the evidence was not relevant for this purpose because the prior injuries did not prove that the fatal injury suffered by Cain was intentionally inflicted and, most importantly, because there was no dispute that the fatal injury was intentionally inflicted. It is clear, however, that evidence of battered child syndrome is probative even though it does not purport to show the identity of the batterer, but to show that the child was a battered child and the blow was not an accident. *Estelle*, 502 U.S. at 68.

Although the defendant argues that there was no dispute that the fatal blow to Cain was not accidental, this does not mean that the battered child syndrome evidence was without probative value. While the defendant now claims that he did not dispute that the fatal injury was not accidental, this did not relieve the State from the burden of showing at trial that the injury was not accidental. See *Estelle*, 502 U.S. at 69-70. The State had the burden to show that the injury to Cain was not an accident. The battered child syndrome evidence, including the evidence of prior injuries, was probative for this purpose in that it tended to show that Cain was a battered child and that the fatal injury was not accidental. At the same time, its prejudicial effect is apparent. While this case presents a close question, we are not prepared to conclude that no reasonable person would agree with the admission of the questioned evidence. Accordingly, we conclude that no abuse of discretion has been established.

## (5) PROSECUTORIAL MISCONDUCT

The defendant contends that the State's attempt to introduce inadmissible evidence constituted prosecutorial misconduct requiring that we grant him a new trial. He argues that the persistent attempts of the State to introduce irrelevant, prejudicial, and inadmissible evidence violated his right to due process and a fair trial.

The defendant points to four separate grounds for the finding of prosecutorial misconduct: (a) the State's attempted inquiries of prior incidents of abuse although such were immaterial and inadmissible, (b) the State's attempt to introduce evidence of the defendant's temper in violation of a motion in limine, (c) the State's attempt to introduce the statements of the victim in violation of a motion in limine, and (d) the State's attempt to argue improper and irrelevant matters in closing argument.

### a. Inquiries into prior instances of abuse

First, the defendant contends that the State committed prosecutorial misconduct by attempting to inquire into prior instances of abuse that were not relevant in an attempt to use them to infer that the defendant was guilty of battering Cain. The bulk of this assertion is directed toward the introduction of evidence on battered child syndrome. We have concluded that this evidence was admissible.

### b. Inquiry into unrelated instances of defendant's temper

Prior to trial, the trial court granted a motion in limine which ordered the State not to present evidence involving prior abuse of Pardekooper by the defendant or confrontation between the parties. However, the motion did not, as the defendant now claims, prohibit the State from presenting evidence involving "displays of violence or temper by the defendant."

The conduct giving rise to defendant's claim occurred during the cross-examination of Christopher Kirkham, a co-worker of Pardekooper. Kirkham had earlier testified that after receiving the telephone call from the defendant that Cain had stopped breathing, Pardekooper did not seem upset. On cross-examination, the prosecutor attempted to ask Kirkham whether he had ever seen

the defendant in a rage. The defendant immediately objected on the grounds that it was beyond the scope of direct and also a violation of the motion in limine and demanded a mistrial. The trial court denied the motion for mistrial but sustained the objection and admonished the prosecutor, stating that the question was well beyond the scope of direct.

We have stated that the reason for an order in limine is that evidence will be inadmissible at trial and the mere offer of such inadmissible evidence or statements made during trial concerning such inadmissible evidence will tend to prejudice the jury. *State v. Massey*, 242 Kan. 252, 265, 747 P.2d 802 (1987). In evaluating alleged violations of an order in limine, it must first be found that a violation occurred and then determined whether the facts elicited in violation of the order substantially prejudiced the defendant. *State v. McClanahan*, 259 Kan. 86, 96, 910 P.2d 193 (1996).

Contrary to the defendant's assertion, the motion in limine did not prohibit evidence of the defendant's temper. Rather, it prohibited evidence of altercations between the defendant and Pardekooper. That said, however, the State was certainly skirting the edge of a violation by asking Pardekooper's co-worker if he had ever seen the defendant in a rage. An answer was never given, however, because the trial court sustained the defendant's objection on the grounds that the question was well beyond the scope of direct examination. Prompt action by the trial court prevented any answer which would have caused prejudice, and the jury was instructed to disregard the comment. Under these circumstances, no violation of the motion in limine occurred, and there was no prejudicial error.

### c. Inquiry into the statements of Cain

The trial court ordered the exclusion of any statement made by Cain in response to a question from Melissa Carroll as to whether the defendant had pulled on his ear. The court directed the State not to refer to such comments in opening argument and to ask for a hearing on reliability outside the jury before going into the statements.

During the questioning of Courtney Leutje, the State asked her whether she noticed bruising around Cain's ear. When Leutje answered in the affirmative, the State asked what she did next, to which Leutje stated that Melissa asked Cain a question. The State then stated: "Okay. You can't tell us what he said. Did you do anything else with Cain?" Leutje then testified that she checked Cain for other bruises.

When Carroll testified, the State asked her if she had asked Cain what had happened to his ear. The State then asked: "Without telling us what he said, did he answer you?" When Carroll replied in the affirmative, the State asked: "Based on what he answered to you, did you do anything else with him?" Carroll replied that she asked him another question, to which the State then asked: "What did you ask him?" At this point, the defendant objected. The State insisted that it should be allowed to ask the question because Carroll's response would be that she asked Cain if Pardekooper had pulled on his ear. The court refused to allow it.

Once again, although the State did not actually violate the motion in limine as the State did not ask what Cain said, the State skirted the motion by inquiring as to the subsequent questions asked even though the trial court had notified the State that it should request a hearing prior to delving into the area to determine if Cain's statements would be admissible. However, prompt action by the trial court prevented any violation of the motion in limine and also prevented prejudice to the defendant, because no answer was given.

### d. Remarks at closing argument

The defendant contends that the State improperly attempted to suggest that the defendant had previously battered Cain and, therefore, had done so during the fatal incident. The record reveals that during closing argument, the State informed the jury that it had presented the incidents of prior abuse because "no, they couldn't be proved who the perpetrator was, but a strong fact was, is that [Cain] was alone with [the defendant]." Later, noting that the old scarred injury to the abdomen was relevant, the State asserted: "Why is that important? Because you see, [the defendant]

had hit Cain Baker prior to that time." This comment drew an objection, and the jury was admonished to disregard it.

We have held:

"No rule governing oral argument is more fundamental than that requiring counsel to confine remarks to matters in evidence. The stating of facts not in evidence is clearly improper. However, in summing up a case, a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence." *State v. Foster*, 259 Kan. 198, Syl. ¶ 2, 910 P.2d 848 (1996).

Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the defendant and deny him a fair trial. *State v. Sexton*, 256 Kan. 344, 363, 886 P.2d 811 (1994). In determining whether a new trial should be granted for prosecutorial misconduct, this court has stated that there are three factors to consider:

" 'First, is the misconduct so gross and flagrant as to deny the accused a fair trial (*i.e.*, are the objectionable statements likely to affect the jurors to the defendant's prejudice)? Second, do the remarks show ill will on the prosecutor's part? Third, is the evidence against the defendant of such a direct and overwhelming nature that it can be said that the prejudicial remarks of the prosecutor were likely to have little weight in the minds of the jurors?' " *State v. Foster*, 259 Kan. at 204 (quoting *State v. Lewis*, 238 Kan. 94, 98, 708 P.2d 196 [1985]).

The defendant did not object to the prosecutor's first comment. Kansas does not follow the "plain error" rule used in federal courts; reversible error cannot be predicated upon a complaint of misconduct of counsel during closing argument where no contemporaneous objection has been lodged. See *Sexton*, 256 Kan. at 363.

The defendant did object to the second comment that the defendant had hit Cain Baker prior to the time of the fatal injury. The defendant argues that the effect of the comment was to suggest to the jury that because Cain had been injured before, the defendant was the one who had done so and therefore the defendant most likely was the person who had fatally injured Cain.

The trial court sustained the defendant's objection and ordered the jury to disregard the State's remark. We have stated that improper remarks made by the prosecuting attorney in summation to the jury will not provide a basis for reversal where the jury has

been instructed to disregard the same unless the remarks were so prejudicial as to be incurable. *State v. Zamora*, 247 Kan. 684, 659-60, 803 P.2d 568 (1990).

In *State v. Spresser*, 257 Kan. 664, 668-72, 896 P.2d 1005 (1995), we examined a comment by a prosecutor that while the jurors were not to consider punishment, " '[a]t the same time you may have other victims' lifes [*sic*] in your hands if we release him.' " The trial court in *Spresser* sustained an objection to the comment. We stated:

"Although we have recognized there may be remarks that are so prejudicial as to be incurable, neither the briefs of counsel nor our research has disclosed a case where we have held the remark to be incurable. The facts herein do not support declaring the improper remark to be the first incurable remark in our case law. It is difficult to understand why such an experienced prosecutor as the Shawnee County District Attorney would make such a patently improper comment in closing argument, but that fact does not alter the outcome of the issue. We find no reversible error in this issue." 257 Kan. at 672.

The patently improper comment in this case was made by the same prosecutor as referred to in *Spresser*. Again, however, this does not alter the outcome. The cautionary instruction by the trial court in this case prevented reversible error.

## (6) REFUSAL TO STRIKE PROSPECTIVE JURORS FOR CAUSE

The defendant contends that the trial court erred in failing to remove two potential jurors for cause. He contends that both potential jurors indicated that they could not be fair and therefore he was forced to use his peremptory challenges to exclude them from the jury.

A recitation of the specific facts surrounding the challenges is necessary for analysis of this issue. During voir dire, a prospective juror, Paul Honaker, stated that he owned his own accounting firm and that Detective Mills was a client of the firm. Honaker stated that his firm does a lot of work for police officers and he has a great deal of respect for them and he did not think that Mills would lie. However, he promised to keep an open mind. Later, Honaker

was asked by the defendant's counsel about Mills, and the following colloquy occurred:

"[Defense Counsel]: Well, I think [the prosecutor] said yesterday that Detective Mills is going to be a key witness in this case. If one of the questions in this case depended upon whether or not you believed what Detective Mills has to say, would you be predisposed to believe it if you didn't know—this is sort of hypothetical, but not really. If you heard a statement from Detective Mills, well, you know, and I think from yesterday I got the feeling that you had a lot of respect for law enforcement and everything, and then you have a statement from someone that you don't know, you don't know anything about them, if it comes down to believing between those two statements, you're going to pick Detective Mills, aren't you?

"Mr. Honaker: Yes.

"[Defense Counsel]: Because you would find him credible?

"Mr. Honaker: Yes.

"[Defense Counsel]: So really basically I think what you're telling me is you can't be objective when it comes to deciding whether or not Mr. Mills is telling the truth, because you are going to believe that he's telling the truth?

"Mr. Honaker: I think anybody that sits on the jury is going to have to decide who they think is telling the truth one way or the other.

"[Defense Counsel]: I agree.

"Mr. Honaker: And they're going to have to decide, like myself, is Randy Mills more credible or *is this other individual more credible?* The—the officers that I know, I would—they carry a lot of weight with me, yes, and if there were two individuals and one of them was a police officer that I knew, sure, I would respect his opinion more than the other one.

"[Defense Counsel]: So you would give his opinion more credibility?

"Mr. Honaker: Yes.

"[Defense Counsel]: Than the person you didn't know?

"Mr. Honaker: Yes.

"[Defense Counsel]: So you really couldn't be fair.

"Mr. Honaker: I suppose if you want to look at it like that, I suppose that's true."

## The defendant challenged Honaker for cause. The trial court ruled:

"I don't believe this satisfies a strike for cause. And one of the things that I will be giving on a preliminary jury instruction if you are selected is that you have the right to determine the weight and credit to be given to the testimony of each witness. You use common knowledge and experience in regard to the matter about which the witnesses testify. And I think basically that's what Mr. Honaker has stated that he would do, and part of his experience is he doesn't have a personal relationship with the witness, he's merely a client at his business. I don't think it satisfies for cause."

Sylvia Farmer was questioned about her ability to view the evidence fairly and impartially. Farmer had earlier indicated that she had a 6-year-old grandson. Defense counsel questioned Farmer as to whether she could view the explicit photographs without letting her emotions influence her verdict. Farmer indicated that she did not know, and the following colloquy occurred:

"Ms. Farmer: Not really, no. I feel a lot of times just anger, you know, that someone could do anything to a child, whether it's—whether he dies or if he's just harmed, you know, so—

"[Defense Counsel]: Well, everybody feels that way.

"Ms. Farmer: I know, but I just—I don't know.

"[Defense Counsel]: But is that feeling going to be so strong that it's going to be a controlling factor? Is that feeling going to not allow you to look at the evidence fairly? Is what you're telling me, the main thing is, is that it's a child and it's hurt?

"Ms. Farmer: Yeah, really.

"[Defense Counsel]: Is that a controlling—

"Ms. Farmer: Uh-huh.

"[Defense Counsel]: Well, the judge is going to instruct you that you can't let sympathy and emotions like that enter into your decision. Are you going to be able to follow that instruction?

"Ms. Farmer: I don't think so. I don't know.

"[Defense Counsel]: Well, you are the only one that does know. You don't think so?

"Ms. Farmer: No, I really don't.

"[Defense Counsel]: So what you're telling me is that no matter what the judge tells you, you're still going to feel the same way?

"Ms. Farmer: Probably, yeah. I mean, it's my emotions.

"[Defense Counsel]: And you're not going to be able to set them aside in deciding this case?

"Ms. Farmer: I don't think I can.

"[Defense Counsel]: And you're not going to really be able to listen to the evidence?

"Ms. Farmer: I could listen to it, but I—you know, it's going to be very, very difficult.

"[Defense Counsel]: There's a difference—

. . . .

"Ms. Farmer: Yeah, but I mean, I feel like I'm boiling, it upsets me so much.

"[Defense Counsel]: The question in this case is going to be not whether the child was harmed, but who harmed the child.

"Ms. Farmer: Uh-huh.

"[Defense Counsel]: Now, is the fact that the child was harmed going to upset you so much that you're not going to be able to push that aside and look at the question of who?

"Ms. Farmer: I don't know. I don't know that I can separate it.

"[Defense Counsel]: You know, I need to know.

"Ms. Farmer: I'm telling you how I feel and what I can tell you. I just don't—

"[Defense Counsel]: You don't think you could?

"Ms. Farmer: I really don't.

"[Defense Counsel]: Even if the judge tells you you have to, you don't believe that you're going to be able to do that?

"Ms. Farmer: No."

The defendant challenged Farmer for cause. The court questioned Farmer:

"The Court: Well, I think, if I heard you correct, Ms. Farmer, what I think you said was you weren't sure that because of the accusation here would overcome you so much that you could hear the evidence. Do you understand what I'm saying?

"Ms. Farmer: Yeah.

"The Court: Can you—and it's very speculative here to ask you that, but are you so overcome by the accusation that you really can't—and you said you get to the point where you boil over—that you can't hear evidence or anticipate being able to hear anything about the case because of the accusation?

"Ms. Farmer: Oh, I could hear it and listen, you know, but I—I don't know whether I could go ahead, though, at the very end, you know, how I would feel.

"The Court: No one does.

"Ms. Farmer: You know, that's—and I just don't want to be unjust to anyone, you know."

The court overruled the defendant's challenge for cause.

A juror may be challenged for cause when the juror's state of mind with reference to the case or any of the parties is such that the court determines there is doubt that the juror can act impartially and without prejudice to the substantial rights of any party. *State v. Johnson*, 253 Kan. 75, 85, 853 P.2d 34 (1993). A trial judge's ruling on a challenge for cause will not be disturbed unless it is clearly erroneous or an abuse of discretion is shown. 253 Kan. at 85.

Assuming arguendo that Honaker and Farmer should have been removed from the jury for cause, the failure to excuse a juror for cause does not constitute a ground for reversal unless the defendant was prejudiced thereby. See *State v. Crawford*, 255 Kan. 47, 51, 872 P.2d 293 (1994). Because the defendant removed both Honaker and Farmer with peremptory challenges, the question we

must decide is whether the jury that actually heard the case was impartial. See 255 Kan. at 51. In *Crawford*, we recognized that although a defendant may be forced to use a peremptory strike to correct the court's error, the mere loss of that peremptory strike does not constitute a violation of the constitutional right to an impartial jury. 255 Kan. at 51-52. This is because peremptory challenges are means to achieve the end of an impartial jury, and so long as the jury that ultimately sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated. 255 Kan. at 52.

In this case, although the defendant claims that he was forced to use two of his peremptory challenges to correct the court's error, he points to no other persons on the jury that ultimately sat that he would have stricken given more peremptory challenges. His claim of prejudicial error fails.

The defendant also argues that although his Sixth Amendment right to a fair and impartial jury may not have been violated, his statutory right under K.S.A. 22-3412 was violated. However, *Crawford* controls. The whole purpose of peremptory challenges is as a means to achieve an impartial jury. See 255 Kan. at 53. There is no evidence that the jury constituted was not impartial.

## (7) FAILURE TO SEQUESTER RHONDA PARDEKOOPER

The defendant argues that the presence of Pardekooper throughout the trial violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and his statutory right under K.S.A 22-2903.

K.S.A. 22-2903 provides:

"During the examination of any witnesses or when the defendant is making a statement or testifying the magistrate may, and on the request of the defendant or state shall, exclude all other witnesses. He may also cause the witnesses to be kept separate and to be prevented from communicating with each other until all are examined."

Sequestration of witnesses on a request of the defendant or the State is mandatory at preliminary hearings. At trial, sequestration is not a right but is committed to the sound discretion of the trial

court. In the absence of evidence that the presence prejudiced the defendant, the trial court's decision will not be reversed on appeal. *State v. Dunn*, 243 Kan. 414, 428, 758 P.2d 718 (1988).

The trial court also considered K.S.A. 1997 Supp. 74-7335, part of the Bill of Rights for Victims of Crime Act. K.S.A. 1997 Supp. 74-7335(a), which provides that "[t]he victim of a crime or the victim's family shall be notified of the right to be present at any public hearing or any juvenile offender proceeding concerning the accused or the convicted person or the respondent or the juvenile offender." The phrase "public hearing" is defined to include preliminary hearing, trial, sentencing, sentencing modification, public comment sessions, expungement hearing, and granting of probation or parole by a judge. K.S.A. 1997 Supp. 74-7335(c)(1). The phrase "victim's family" is defined to include a spouse, surviving spouse, children, parents, legal guardian, siblings, stepparent, or grandparents. K.S.A. 1997 Supp. 74-7335(c)(2).

Pardekooper was the mother of Cain and has a right under K.S.A. 1997 Supp. 74-7335 to be present at trial. However, she was also a witness at trial, and the question involves Pardekooper's right to be present *vis-a-vis* the right of the defendant to a fair trial.

The sequestration of witnesses is a centuries-old practice which descends from the common Germanic law. See *Geders v. United States*, 425 U.S. 80, 87, 47 L. Ed. 2d 592, 96 S. Ct. 1330 (1976). Its aim is to exercise a restraint on witnesses tailoring their testimony to that of earlier witnesses and aids in detecting testimony that is less than candid. 425 U.S. at 87.

K.S.A. 1997 Supp. 74-7335 is subordinate to the right of the defendant to a fair trial. In this case, Pardekooper was not only the mother of Cain but she was also the only other person who could have inflicted Cain's injuries. The evidence in the trial clearly showed that Cain's death resulted from a blunt trauma intentionally inflicted. The only fact question to be resolved by the jury was whether the defendant or Pardekooper inflicted the fatal injury. Under these circumstances, the opportunity for Pardekooper to be present in the courtroom and tailor her story to the evidence as it developed had the potential to violate the defendant's right to a fair trial. By allowing Pardekooper to remain, the trial court abused

its discretion. However, absent evidence of prejudice, the error is not reversible. *State v. Dunn*, 243 Kan. at 428.

The defendant argues that in Pardekooper's conversations with police at the hospital, she stated that she put Cain to bed herself, while when Pardekooper later testified after hearing of these statements, she claimed that the defendant carried Cain to bed and that she had no contact with him that night. This argument is contrary to the evidence. While Pardekooper initially told police she put Cain to bed on Friday night, she later told Detective Mills that the defendant had been the one to put Cain to bed. Pardekooper's testimony at trial was essentially consistent with the story that she told Detective Mills at the police station. Thus, the defendant failed to demonstrate that Pardekooper's presence at trial resulted in any tailoring of her testimony.

## (8) FAILURE TO SUPPRESS THE DEFENDANTS STATEMENTS

*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), holds that the State may not use statements stemming from a custodial interrogation of a defendant unless the State demonstrates the use of procedural safeguards to secure the defendant's privilege against self-incrimination. *State v. Ewing*, 258 Kan. 398, Syl. ¶ 1, 904 P.2d 962 (1995). However, an officer's obligation to administer a *Miranda* warning attaches only where there has been such a restriction on the suspect's freedom so as to render him or her in custody. 258 Kan. at 402.

In determining whether an individual was in custody, the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. 258 Kan. at 402. It does not matter whether the interrogating officers had focused their suspicions upon the individual being questioned if those suspicions are not disclosed to the defendant. Rather, the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation. 258 Kan. at 402. This inquiry is made on a case-by-case basis. *State v. Fritschen*, 247 Kan. 592, 603, 802 P.2d 558 (1990).

The defendant argues that any reasonable person whose child had been taken to the hospital with a serious injury, whose apartment had been searched by police, and who was requested by the police to come down to make a statement, put in a police car and driven to the station would feel he or she is in custody.

The facts presented at the suppression hearing show that the defendant's contact with the police was fairly limited up until the time that Detective Mills told him that he wished to speak to him. Although the defendant had earlier been asked for permission to search the defendant's residence, Corporal Conklin had explained that the permission would be to help the police determine what might have caused the injury. Detective Mills further explained to the defendant and Pardekooper that he thought the police station might be the best place to talk and offered to give the defendant and Pardekooper a ride, which they voluntarily accepted.

An interview at a police station does not necessarily transform the interview into a custodial interrogation. See *Fritschen*, 247 Kan. at 603-04. In *Fritschen*, we concluded that an interview of the defendant at the police station was not custodial interrogation where the accused voluntarily went to the station for an interview, was subject to low-key interviewing tactics, and was free to leave. 247 Kan. at 604.

The defendant in this case voluntarily went to the police station to be interviewed. Prior to his interview, he sat in the waiting room but was not restrained in any way. The trial court did not err in denying the defendant's motion to suppress.

### (9) IMPOSITION OF DEPARTURE SENTENCE

This issue is moot because under the facts of this case, the convictions of child abuse and felony murder violated the defendant's rights under the Double Jeopardy Clause of the United States Constitution.

### (10) CUMULATIVE ERRORS

The defendant's final argument is that the cumulative trial errors in this case entitle him to a new trial. He contends that the errors

in this case were so great, taken together, that they denied him a fair trial.

We have recognized that cumulative trial errors may be so great as to require reversal of a defendant's conviction. See *State v. Castoreno*, 255 Kan. 401, 411, 874 P.2d 1173 (1994). The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. 255 Kan. at 411. In this case we have addressed each error raised by the defendant. Except for reversing the defendant's conviction for child abuse, we have concluded either no additional errors occurred or no prejudice was established. Potential problems in this case were averted by the prompt action of the trial court. Further, we have considered the cumulative effect any of the errors might have had on the defendant's right to a fair trial and conclude that under the totality of the circumstances, the defendant's right to a fair trial was not impaired.

The defendant's conviction for abuse of a child is reversed, and his sentence for that offense is vacated. The defendant's conviction and sentence for first-degree felony murder is affirmed.

Affirmed in part and reversed in part.